RENDERED: AUGUST 16, 2018
TO BE PUBLISHED

# Supreme Court of Kentucky FINAL

2017-SC-000147-MR DATE 9/6/18 Kim Redmon, DC

DANIEL COX        APPELLANT

ON APPEAL FROM HARDIN CIRCUIT COURT
V.      HONORABLE KEN HOWARD, JUDGE
NO. 15-CR-00424

COMMONWEALTH OF KENTUCKY        APPELLEE

**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**AFFIRMING**

A circuit court jury convicted Daniel Cox of the murder of his four-month-old son, Jayceon Chrystie, and recommended a sentence of imprisonment for life. Cox now appeals from the resulting judgment as a matter of right,[1] raising two issues. Finding no reversible error, we affirm the judgment.

## I. BACKGROUND.

One evening, Daniel Cox drove to the home of Kimberly Chrystie, Jayceon's mother, and picked Jayceon up for a visit. Over the span of the next two hours, Cox made a couple of stops at the home of family and friends before

---

[1] Ky. Const. § 110(2)(b).

Jayceon became fussy, and Cox decided to return him to Kimberly. Riding home in a car seat in the back seat of Cox's car, Jayceon cried nonstop. What happened on that fateful drive to Kimberly's home gave rise to the criminal charge that Cox murdered his son.

Cox testified at trial that as he drove he turned around and shook and rocked Jayceon's car seat in an effort to calm him and stop him from crying. He testified that the more Jayceon cried the harder he shook the car seat and that the shaking lasted four to five seconds in duration. Cox denied hitting Jayceon.

Britton and Dena Stevenson, who were traveling the same highway that evening, fell in behind Cox, who was en route to Kimberly's home with Jayceon in a car seat in the backseat. Dena testified at trial that she saw Cox swinging back at something in the backseat. She testified that Cox's car swerved over into the opposite lane when the driver would swing. She saw this occurring for a while before Britton also noticed the driver swinging and swerving. Dena testified that she saw the driver swinging back at Jayceon several times and shake Jayceon one time. Britton testified that he saw Cox strike Jayceon two or three times and shake Jayceon forcefully.

As Cox got closer to Kimberly's home, he noticed that Jayceon had gone quiet. He saw that the infant was limp and that his eyes appeared to be rolling back into his head.

When Cox arrived at Chrystie's residence, he removed Jayceon from the car seat, handed him to Chrystie, and apologized to her, telling her he did not

2

mean to hurt Jayceon. Cox told Chrystie that Jayceon had fallen out of his car seat.

Upon seeing her child, Chrystie noticed he was not strapped into the car seat, was not breathing, and his eye was swollen. She called 911 while one of her neighbors attempted CPR. The police arrived and took over. Jayceon was transported first to the local hospital and then to a Louisville hospital, where he died two days later. Police arrested Cox soon after he left Kimberly's residence.

At trial, the Commonwealth introduced text messages sent by Cox to Kimberly less than three days before the incident. Because excerpts of some of these messages are the subject of one of the issues Cox has raised on appeal, we reproduce them below:

1. I didn't want the lil whining bastard. U spit the bitch out you deal with him.

2. I didn't want the drooling bastard. I tried to get u to abort the water head crying faggoting bitch. Nothing that's going on in his life interest me. If he dead or living is no concern to me.

3. I didn't hit u with that because I don't give fuck if I see him or not. [He] ain't shit to me. I didn't want him anyway and I have a choice if I wanna fuck with the jughead bitch. I don't want u to try with me. Fuck him. Let's sign over rights. I don't want no dealings with that retarded looking ass boy. Fuck [him]. I didn't want the crying big head ass baby and I don't want him.

4. Fuck that jaw humongous head bitch that you call yo son. I can't stand that bastard. I can't stand yo ass. I hate you and that retarded ass boy.

5. I don't want you I don't want [him].

The Commonwealth presented expert medical testimony at trial. One doctor testified Jayceon died of an inflicted closed-head injury, inconsistent with a fall from a car seat, blunt trauma to both eyes and bruising in the recessed portion of his eyes, and a massive intracranial insult resulting in internal bleeding over the top of his brain, causing him to stop breathing. The doctor testified that Jayceon's injuries were consistent with being struck, and not from a fall or from a baby being shaken. Another doctor testified that, in her medical opinion, Jayceon suffered from inflicted physical abuse.

## II. ANALYSIS.

### A. The jury instructions did not violate Cox's right to a unanimous jury verdict.

Cox first argues that the trial court erred when its instructions to the jury failed to require the jury reach a unanimous decision on the specific physical act by Cox that caused Jayceon's death. That this issue is preserved for our review is undisputed.

The jury instruction on murder in this case stated the following:

You will find the Defendant guilty of Murder under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That ... the Defendant, by hitting, shaking or both, killed Jayceon Christie; AND

B. That in so doing:

    (1) He caused the death of Jayceon Christie intentionally; OR

    (2) He was wantonly engaging in conduct which created a grave risk of death to Jayceon Christie and thereby caused the death of [his son] under circumstances manifesting an extreme indifference to human life.

4

The jury found Cox guilty under this instruction.

Cox challenges the jury instruction for its inclusion of the phrase, "hitting, shaking or both." Cox essentially argues that this instruction is flawed because it failed to require all twelve members of the jury to identify the specific physical act by Cox that caused Jayceon's death.[2] We reject Cox's argument that principles of jury unanimity require such specific fact-finding by the jury.

In *Martin v. Commonwealth*, this Court identified the two types of "unanimous-verdict violations."[3] "The first type ... occurs when multiple counts of the same offense are adjudicated in a single trial."[4] *Id.* This type is not at issue in this case because Cox was charged with only one count of murder.

The second type "occurs when a jury instruction may be satisfied by multiple criminal acts by the defendant."[5] More specifically, this requirement "is violated when 'a general jury verdict [is] based on an instruction including two or more separate instances of a criminal offense, whether explicitly stated in the instruction or based on the proof.'"[6] This type of unanimous-jury violation is also not at issue here because only one murder occurred.

---

[2] "Section 7 of the Kentucky Constitution requires a unanimous verdict reached by a jury of twelve persons in all criminal cases." *Wells v. Commonwealth*, 561 S.W.2d 85, 87 (Ky. 1978) (internal citations omitted).

[3] 456 S.W.3d 1, 6 (Ky. 2015).

[4] *Id.*

[5] *Id.* at 7.

[6] *Id.* at 6-7 (quoting *Johnson v. Commonwealth*, 405 S.W.3d 439, 449 (Ky. 2013)).

A seemingly third type of unanimity error also appears to exist in our jurisprudence—a potential violation of unanimity stemming from a "combination jury instruction." "A 'combination' instruction permitting a conviction of the same offense under either of multiple alternative theories does not deprive a defendant of his right to a unanimous verdict, so long as there is evidence to support a conviction under either theory."[7] "It is not necessary that a jury, in order to find a verdict should concur in a single view of the transaction disclosed by the evidence. If the conclusion may be justified upon either of two interpretations of the evidence, the verdict cannot be impeached by showing that a part of the jury proceeded upon one interpretation and part upon the other ... ."[8]

For additional guidance, as we have done so before,[9] we turn to the U.S. Supreme Court's explanation of this issue:

> Crimes are made up of factual elements, which are ordinarily listed in the statute that defines the crime. A (hypothetical) robbery statute, for example, that makes it a crime (1) to take (2) from a person (3) through force or the threat of force (4) property (5) belonging to a bank would have defined the crime of robbery in terms of the five elements just mentioned. Calling a particular kind of fact an "element" carries certain legal consequences.[10] The consequence that matters for this case is that a jury in a ...

---

[7] *Robinson v. Commonwealth*, 325 S.W.3d 368, 370 (Ky. 2010) (citing *Johnson v. Commonwealth*, 12 S.W.3d 258, 265-66 (Ky. 1999)); *Miller v. Commonwealth*, 77 S.W.3d 566, 574 (Ky. 2002)).

[8] *Wells v. Commonwealth*, 561 S.W.2d 85, 88 (Ky. 1978).

[9] *See Johnson v. Commonwealth*, 405 S.W.3d 439 (Ky. 2013) (examining federal law to assist in defining the unanimity concept).

[10] *Almendarez-Torres v. United States*, 523 U.S. 224, 249 (1998).

criminal case cannot convict unless it unanimously finds that the Government has proved each element.[11]

> [A] ... jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime. Where, for example, an element of robbery is force or the threat of force, some jurors might conclude that the defendant used a knife to create the threat; others might conclude he used a gun. But that disagreement—a disagreement about means—would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely, that the defendant had threatened force.[12]

As the U.S. Supreme Court has made clear, whether a unanimous verdict violation stems from a "combination jury instruction" first depends on whether a particular kind of fact constitutes a "factual element[] ... listed in the statute that defines the crime."

At its most basic definition of Murder, KRS 507.020(1)(a) states, "A person is guilty of murder when: With intent to cause the death of another person, he causes the death of such person ... ." At its core, a conviction for murder requires the Commonwealth to prove beyond a reasonable doubt that the defendant (1) intended to cause the death of another person and (2) did indeed cause the death of that person.

A conviction for murder, according to the statute, does not require the fact-finder to determine the precise physical act of Cox that was the actual cause of Jayceon's death. All that must be shown, to satisfy the element of

---

[11] *Johnson v. Louisiana*, 406 U.S. 356, 369-71 (1971) (Powell, J., concurring); *Andres v. United States*, 333 U.S. 740, 748 (1948).

[12] *Richardson v. U.S.*, 526 U.S. 813, 817-18 (1999) (internal citations omitted).

causation under the statute, is that the defendant did *something* to cause the death of the victim.

What Cox argues in this case is that the jury instructions did not force the jury to agree upon the specific physical act that Cox performed to cause Jayceon's death. But the specific physical act that Cox performed to cause Jayceon's death is not the "factual element[] ... listed in the statute that defines the crime;" rather, *causing the death* is.

The dispute as to the specific physical act that Cox performed to cause the death of his son is "a disagreement about means" that "[does] not matter" because "all 12 jurors unanimously concluded that the [Commonwealth] had proved the necessary related element, namely, that" Cox caused Jayceon's death. The jury instruction, while providing the jury with Cox's multiple acts directed at Jayceon to choose from, as described by the trial testimony, forced the jury to agree unanimously that Cox *did something to cause Jayceon's death*, causation being the "factual element[] ... listed in the statute that defines the crime." Because the jury instructions forced the jury to unanimous agreement that Cox caused Jayceon's death, regardless of the specific means, no unanimity error occurred because of the inclusion of the phrase "hitting, shaking or both."

Cox also challenges the jury instruction for its inclusion of an instruction allowing the jury to consider both intentional and wanton murder in the same instruction. Possessing the requisite "intent" to murder is a "factual element[] ... listed in the statute that defines the crime[,]" so we must determine whether

8

a "combination jury instruction" unanimity error has occurred. However, we find no error here because sufficient evidence exists in this case to convict under both theories of culpability.

KRS 501.020 defines the various criminally culpable states of mind. KRS 501.020(1) states, "A person acts *intentionally* with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause that result or to engage in that conduct." KRS 501.020(3) states, "A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."

Here, the evidence supports a conviction under either mental state. Two witnesses testified to having seen Cox hit Jayceon multiple times, specifically, swinging back at him several times, and shaking him a few times forcefully. Cox himself admitted to shaking Jayceon's car seat several times, shaking it harder the more the baby cried. Cox never called 911, although he testified that he did not do so because he panicked. Cox then handed Jayceon over to Kimberly, lying about what happened, telling her he did not mean to hurt him, and fleeing the scene. The medical testimony suggests severe physical abuse. And the text message evidence, sent by Cox to Kimberly less than three days before the incident, potentially sheds light on Cox's mental state during the

9

events in question. Based on all this evidence, it is reasonable for a jury to have inferred an intentional or wanton mental state. "Intent can be inferred from the actions of an accused and the surrounding circumstances. The jury has wide latitude in inferring intent from the evidence."[13]

Lastly, Cox alleges that the trial court committed reversible error by failing to issue a bifurcated instruction of intentional and wanton murder. But, as Cox himself notes, this Court has twice considered this issue, failing to find reversible error in both instances.[14] We are especially inclined to reject Cox's argument because he has conceded that this error was unpreserved, which we review for palpable error. We find no error, palpable or otherwise, in the trial court's combining of the intentional and wanton murder instructions, in accordance with *Hudson* and *Benjamin.*

## B. The trial court did not commit reversible error when it admitted certain evidence of text messages.

Cox alleges that the trial court committed reversible error when it allowed his disturbingly explicit text messages to be admitted into evidence. Specifically, Cox alleges that the text messages should have been excluded under Kentucky Rules of Evidence ("KRE") 404(b) and 403. That this issue is preserved for our review is undisputed.

---

[13] *Anastasi v. Commonwealth*, 754 S.W.2d 860, 862 (Ky. 1988) (citing *Rayburn v. Commonwealth*, 476 S.W.2d 187 (Ky. 1972)).

[14] *See Hudson v. Commonwealth*, 979 S.W.2d 106, 110 (Ky. 1998); *see also Benjamin v. Commonwealth*, 266 S.W.3d 775, 784-85 (Ky. 2008).

"The standard of review of an evidentiary ruling is abuse of discretion."[15] "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[16]

KRE 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:

(1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or

(2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

KRE 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

Regarding Cox's KRE 404(b) argument, the trial court, in a written order responding to Cox's motion in limine, stated that it was allowing the text messages to be submitted into evidence because they were "probative of motive, intent or absent [sic] of mistake or accident." We cannot say that the trial court abused its discretion by allowing evidence of these text messages on that basis.

---

[15] *Anderson v. Commonwealth*, 231 S.W.3d 117, 119 (Ky. 2007).

[16] *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000) (citing *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)).

Cox testified at trial that all he did was shake his son's car seat, that he did not strike Jayceon, and that he did not mean to kill him. He also told Kimberly that Jayceon simply fell out of his car seat. But the text messages tend to belie Cox's claim that the ultimately fatal injuries he inflicted upon Jayceon were a mistake or accident. The messages also assist in showing that Cox really did possess the intent and motive to inflict serious injury and even death upon his son. "Generally, evidence of ... animosity of the defendant against the victim is admissible as evidence of motive, intent or identity ... ."[17]

Cox attempts to analogize this case to our decision in *Rucker v. Commonwealth*, a decision in which we found reversible error in the admission of certain evidence in violation of KRE 404(b).[18] In *Rucker*, the evidence at issue was Facebook messages, sent by the defendant after the victim's death, showing the defendant engaging in sexually explicit conversations with multiple women and sending two sexually explicit photographs to them.[19] We determined that "Rucker's sexually explicit communications to various women were not probative of his state of mind regarding crimes that had already been committed against his former girlfriend."[20] Unlike the situation in *Rucker*, here, Cox's text messages show animosity toward the victim, upon whom he inflicted physical abuse and death, sent less than three days *before* the incident. As

---

[17] *Davis v. Commonwealth*, 147 S.W.3d 709, 722 (Ky. 2004) (citing *Goodman v. Commonwealth*, 285 S.W.2d 146, 149 (Ky. 1955)).

[18] 521 S.W.3d 562, 570 (Ky. 2017).

[19] *Id.* at 568.

[20] *Id.* at 569.

stated, the submission of such evidence is proper under KRE 404(b) because it sheds light on Cox's motive and intent and the absence of mistake or accident.

Additionally, we cannot say that the trial court abused its discretion in allowing the evidence of the messages over a KRE 403 objection. The messages had high probative value, tending to show that Cox may have harbored the intent and motive to inflict serious injury and death upon Jayceon and that the child's death did not result from an accident or mistake. This high probative value cannot be said to be outweighed by any, much less substantial, undue prejudice.

Cox argues that the probative value of the text messages was diminished by the already substantial evidence on the same point. But none of the other evidence sheds light on Cox's expressions of animosity toward Jayceon, which speaks directly to his motive and intent for beating and killing him, in addition to showing an absence of mistake or accident.

Cox also argues that the trial court failed to conduct a KRE 403 analysis because there is no mention in any written order of the trial court's having engaged in the KRE 403 balancing analysis. But Cox cannot point to a single case demonstrating that this Court has found reversible error in an analogous situation. Cox cites *Hall v. Commonwealth* for this proposition, but *Hall* does not stand for such a rule.[21] We also do not require trial courts to make detailed

---

[21] 468 S.W.3d 814 (Ky. 2015) *In Hall,* the Court determined that certain evidence should not have been admitted and only commented that "the absence of specific findings in the record explaining the trial court's reasons for its decision" provided further support for its conclusion. *Id.* At 827.

written findings to support the many evidentiary rulings they must make in the course of a trial.

And, as the Commonwealth notes, the trial court admonished the jury that "[t]he text message are admissible for a limited purpose. That purpose is to prove, if it does so, motive, intent or absence of mistake or accidence on behalf of Mr. Cox. The evidence shall not be used for any other purpose." This admonition alerted the jury to refrain from using the text-message evidence for any other purpose, including the improper purposes listed in KRE 403, than helping to prove Cox's motive or intent and the absence of mistake or accident in this case.[22] So by this admonition, the danger of undue prejudice, if any, was mitigated properly by the trial court.

### III.    CONCLUSION.

Finding no reversible error, we affirm the judgment of conviction and sentence.

All sitting. All concur.

---

[22] "A jury is presumed to follow an admonition...." *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003).

COUNSEL FOR APPELLANT:

Erin Melchior
Melchior law Office

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General