# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

# Supreme Court of Kentucky

2019-SC-0255-MR

KENNETH L. MATTINGLY JR.                                    APPELLANT


                    ON APPEAL FROM JEFFERSON CIRCUIT COURT
                       HONORABLE BRIAN C. EDWARDS, JUDGE
V.                              NO. 18-CR-001495


COMMONWEALTH OF KENTUCKY                                    APPELLEE


## ORDER DENYING PETITION FOR REHEARING

The Petition for Rehearing, filed by Appellant, Kenneth Mattingly, of the

Opinion of the Court, rendered December 17, 2021, is DENIED. However, the

Court, does issue a modified opinion.  Said modification does not affect the

holding of the original Opinion of the Court.

All sitting.  All concur.

ENTERED: April 29, 2021.

_____
CHIEF JUSTICE

# Supreme Court of Kentucky

2019-SC-0255-MR

KENNETH L. MATTINGLY JR.                                           APPELLANT


ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.                HONORABLE BRIAN C. EDWARDS, JUDGE
NO. 18-CR-001495


COMMONWEALTH OF KENTUCKY                              APPELLEE


**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

A circuit court sentenced Kenneth L. Mattingly Jr. to forty years' imprisonment as punishment for his conviction of four counts of first-degree assault, one count of second-degree assault, one count of wanton endangerment, one count of possession of a handgun by a convicted felon, and of being a first-degree persistent felony offender (PFO).

Mattingly appeals from the judgment as a matter of right,[1] raising eight trial errors committed when the trial court allowed the Commonwealth: 1) to introduce a Facebook video from an anonymous tipster allegedly depicting the shooting, 2) to use Detective O'Daniel to narrate a video during his testimony, 3) to use Aleisha Courtney's prior identification of him, 4) to use Detective

---

[1] Ky. Const. § 110(2)(b).

Troutman's prior identification of him, 5) to prosecute the PFO without introducing a certified copy of Mattingly's prior conviction, 6) to use the same prior felony conviction to prove both the handgun charge and as proof in PFO phase status, 7) to introduce as a trial exhibit a summary compiling Mattingly's prior convictions, 8) and when the trial court excluded impeachment evidence that the victims of the crime are suing Mattingly civilly. We find harmless error in the trial court's exclusion of evidence of the victims' lawsuit against Mattingly; otherwise, we find no error and affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A fight broke out in a nightclub. Isiah Fugett started it after he saw Antwan Sartin talking to Alison Collins, the mother of his child. Shots were fired. Sartin was shot in the back of his legs but was unable to see who shot him. Fugett was also shot in the back of the leg and identified Kenneth Mattingly as his shooter during an interview with investigators.

Damian Weathers was roughly forty feet away from the fight and was shot in his right leg. Darrian Collier and John McCloud also suffered gunshot wounds. Collier testified he had no idea who shot him, and McCloud did not testify at trial.

During the initial stages of the investigation, Detective O'Daniel received an anonymous Facebook video of the nightclub melee. The video displayed the shooters wearing white jumpsuits. O'Daniel forwarded the video to other officers to see if anyone could identify individuals in the video. Detective

2

Troutman, a narcotics detective, responded and identified Mattingly in the video based on prior encounters he had with him. Mattingly was then arrested.

At trial, evidence, which included the nightclub's surveillance video, suggested more than one shooter might be involved. But the Commonwealth's theory of prosecution was Mattingly was the lone gunman. Mattingly's defense was that he was not the shooter. The jury convicted Mattingly.

## II. ANALYSIS

### A. The Commonwealth Properly Introduced the Facebook Video.

We review preserved trial errors for abuse of discretion and uphold a trial court's evidentiary ruling so long as it was not arbitrary, unreasonable, or unsupported by law.[2]

Under Kentucky Rules of Evidence (KRE) 901, evidence is properly authenticated when enough information is presented by the proponent to support a finding that the matter in question is what its proponent claims it to be. At trial, defense counsel objected to the Commonwealth's playing a Facebook video of the shooting during the testimony of Kashmir Nash, Antwan Sartin, and Detective O'Daniel. Defense counsel previously filed a motion in limine concerning the video's authentication, but the trial court ruled it could be admitted so long as the footage was corroborated by the surveillance video from the nightclub.

---

[2] *Cox v. Commonwealth*, 553 S.W.3d 808, 814 (Ky. 2018).

Kashmir Nash was at the nightclub the night of the shooting with her brother, who was shot. Nash testified she had previously seen the Facebook video and she did not know who recorded it. But she also testified the video appeared to be taken in the tent at the nightclub on the night of the shooting because of the number and rhythm of the gunshots and the video appeared to be a recording of the events she experienced. The defense alleges this was insufficient authentication because Nash did not specifically state the video fairly and accurately reflected the events of that night. But we find her testimony was sufficient to authenticate the video. She indicated she was there the night of the crime and the video reflected events that appeared to be what she experienced. Her testimony provided the jury with enough information to make a reasonable inference that the Facebook video depicted the night of the shooting. The Facebook video was properly authenticated.

The video's authentication was buttressed during Antwan Sartin's testimony. Sartin was present in the nightclub during the shooting. He testified he was at the bar drinking when he was shot in the leg, although he was unsure where the shots came from. He had seen a video of the shooting while in the hospital and viewed the Facebook video at trial. As the footage played, Sartin identified himself in the corner of the video, but he testified he was unsure if this video and the surveillance video were the same footage.

Despite Sartin's uncertainty that the two videos matched entirely, his testimony provided additional proof of authentication because it reasonably indicated the Facebook video was what it purported to be—a recording of the

4

nightclub scene on the night of the shooting. While Sartin's testimony indicated he had some doubt about whether the two videos were the same, the evidence was sufficient for a reasonable jury to find that the video is what it was purported to be.

Finally, the Facebook video was corroborated, at least in part, by the surveillance footage. The defense argues that because only a spliced version of the surveillance video was played during trial the Commonwealth failed adequately to corroborate the Facebook video. When Detective O'Daniel began to testify about the Facebook video, the defense objected on the grounds the Commonwealth had yet to corroborate the video with the surveillance footage. The trial court overruled the objection and found it to be properly authenticated without complete corroboration. We agree. The testimony by Nash and Sartin made a sufficient showing for the jury to reasonably find that the Facebook video was a recording of the shooting. Additionally, the parts of the surveillance footage that were shown corroborated the Facebook video. For these reasons, we find no error in the trial court's ruling because the video was properly authenticated.

### B. Detective O'Daniel Did Not Improperly Narrate the Surveillance Video Footage.

Mattingly argues that Detective O'Daniel improperly narrated the surveillance and Facebook videos. The Commonwealth argues Mattingly waived this issue by failing to make a contemporaneous objection. Defense counsel filed a motion in limine to exclude Detective O'Daniel's narration of the video, and the trial court delayed ruling on the motion pending specific

5

objections to be made during the testimony. Defense counsel did not object during O'Daniel's testimony. We find the motion in limine militates against a finding of waiver, but the absence of contemporaneous objection at trial renders this claim of error unpreserved. We may review unpreserved trial errors for palpable error. We will not reverse the judgment for a palpable error unless manifest injustice occurred because of the error.[3]

We find Detective O'Daniel's testimony described for the jury how his investigation unfolded, but, overall, he did not improperly interpret the video. The statements by Detective O'Daniel at issue are as follows:

- Detective Troutman was able to see there was a single shooter at the nightclub, and the shooting was inside the club.

- The shooting occurred at 2:54 a.m.

- He watched the camera footage from the surveillance cameras and was able to track the single shooter through the nightclub.

- He was able to establish that the shooter at the nightclub at the time of the shooting was a male and dressed in an all-white jump suit with black on the arm and leg.

- He was able to select still photographs from the video surveillance that depicted the single shooter.

- As best he could tell, there were two other individuals in white jump suits present on the evening of the shooting.

---

[3] *Martin v. Commonwealth,* 207 S.W.3d 1, 4 (Ky. 2006).

- He was able to rule out the other two individuals in white jump suits as the shooter because of their physical characteristics.

- From the video you could tell the shooting took place inside the tent.

- The suspect shot 7 or 8 times.

- He was able to choose still shots of the seven muzzle flashes.

- The Facebook video and surveillance needed to be "cleaned up" before presenting it to the jury.

- He selected clips from the videos and sent them to Shriver, a forensic examiner.

- The Commonwealth's Attorney spliced together portions of the videos from the eleven surveillance videos, and he watched them to be sure they matched what he had seen earlier.

As a preliminary matter, we note that narrative testimony accompanying a video is not necessarily improper.[4]  Interpretation of a video may be improper if the narration ranges beyond the witness's perception in real time and infringes upon the fact-finding role of the jury.[5]  In *Boyd v. Commonwealth*, two lay witnesses narrated a surveillance video, and we found no error in their testimony as to the statements as they observed in real-time.[6]  But we did find

---

[4] *Cuzick v. Commonwealth*, 276 S.W.3d 260, 261-65 (Ky. 2009).

[5] *Boyd v. Commonwealth*, 439 S.W.3d 126, 131 (Ky. 2014) ("We established in *Morgan* that narration of video footage is permissible under certain circumstances, and improper when the witnesses interpret the footage or offer an opinion[.]") (citing *Morgan v. Commonwealth*, 421 S.W.3d 388 (Ky. 2014)).

[6] *Boyd*, at 131 ("Faulkner and Richardson did not interpret the footage, nor did they offer their opinion on the subject.  Faulkner and Richardson merely narrated the

7

harmless error in their testimony to events they did not observe and only later saw on the video.[7]  Error resulted because the testimony exceeded the witnesses' personal knowledge of the events.

We find the majority of Detective O'Daniel's statements describe his investigation as it unfolded.  The statements describe his investigative process. While he was not at the scene when the shooting occurred, he had personal knowledge of his own investigation and how the scene depicted in the video influenced him.  So, most of his testimony was undoubtedly proper because lay witnesses may testify to circumstances within their personal knowledge.

Some statements by O'Daniel are arguably interpretive as they are his opinions of what he observed from the video.  But they also could be describing his line of thought during the investigation.  Even if these statements were decidedly interpretative, they would constitute error that is not palpable.  In *Boyd*, we found lay witness testimony interpreting events they did not personally perceive to be harmless error because the jury was able to view this video for themselves and draw their own conclusions.[8]

We find similar circumstances here as in *Boyd*.  No palpable error occurred.  No potentially interpretative statement was overtly prejudicial or even mentions Mattingly.  One such statement, for example, includes

---

events as they occurred and did not testify to anything that the jury could not see for themselves. Thus, the trial court did not commit error in allowing narrative testimony regarding events perceived in real time by Faulkner and Richardson[.]").

[7] *Id.* at 132; Kentucky Rules of Evidence KRE 602 and 701.

[8] *Id.*

O'Daniel's statement "as best he could tell" there were two gunmen, which potentially cued the jury that this testimony is inconclusive and made in reliance on his belief from his investigation. The jury could then infer that there were or were not two gunmen.

The second potentially interpretative statement, "you could tell the shooting took place inside the tent," is conclusive and may have encroached upon the province of the jury, but this statement did not likely substantially affect the outcome of the trial. The fact that the shooting took place inside in the tent was not in dispute because the tent was mentioned in several other instances throughout trial, and the jury could observe the tent in the video. As a result, we find any potential error was not palpable.

## C. The Commonwealth Properly Introduced a Prior Alleged Identification of Mattingly by Aleisha Courtney.

Mattingly argues that the trial court improperly admitted a prior identification of him by Aleisha Courtney. This claim of error was preserved.

Courtney testified that she was questioned about the shooting at the nightclub during a traffic stop where she explained that she was not present. The Detective then showed her two mugshots on his phone, and she was unable to identify either person. She further testified that a week before trial she was questioned at her home and was shown four or five still photographs from the surveillance video and asked to identify Mattingly.

The Commonwealth impeached this testimony by playing a recording of Courtney's questioning at home when she said she "can see in the color photograph that its him" and that she also recognized Slush Jackson. The

recording also relayed the Commonwealth's attempt to persuade her to help them set Mattingly up, but she refused.

We find the prior identification of Mattingly by Courtney was properly introduced. Under KRE 602 and 701, an identification may be made by a witness so long as that witness has personal knowledge of the person's identity. Here, Courtney had known Mattingly for 6 years before, and they shared a child together. She has personal knowledge of Mattingly's identity and could testify to the identification she made of him during the photo viewing. While the inconsistency between Courtney's testimony and the recording of her interview may diminish the credibility of her identification of Mattingly, it does not mean the identification was improperly introduced. Courtney had prior knowledge of Mattingly's identity and therefore could testify as to his identity at trial.

### D. Detective Troutman Was Properly Allowed to Identify Mattingly in Court from The Photos Sent by Detective O'Daniel.

Mattingly argues that Detective Troutman's identification of him had improperly identified him from prior encounters instead of the event itself. This claim of error was preserved.

While investigating this matter, Detective O'Daniel sent other officers still shots of the crime scene from the security footage. Detective Troutman responded that he could identify the man in the photo as Mattingly. Troutman then testified at trial that he knew Mattingly was the person in the photo based on two earlier interactions with him.

10

We find the identification of Mattingly by Detective Troutman to be proper. Under KRE 602 and 701, a prior identification is proper so long as the witness has personal knowledge of the person's identity. Here, Detective Troutman had interacted with Mattingly on two earlier occasions that made him familiar with his physical characteristics. He therefore had personal knowledge of Mattingly's identity that allowed him to make an identification and testify to it as well.

Mattingly argues Detective Troutman's testimony regarding his identification of him was substantially more prejudicial than probative and should have been excluded. We disagree. Under KRE 403, evidence should be excluded if its probative value is substantially outweighed by its potential prejudice to the defendant. Troutman's identification was highly probative of Mattingly's identity in committing the crime. It explained how the investigation unfolded and why Detective O'Daniel investigated Mattingly.

The defense contends that Troutman's testimony was unduly prejudicial because the jury knew he was a narcotics detective and investigated drug crimes; therefore, the jury became aware of Mattingly's past encounters with narcotics officers. Importantly, however, no testimony was given on how Troutman had interacted with Mattingly or that he had previously arrested him. While the jury's knowledge that Mattingly had interacted in the past with a narcotics agent does result in a potentially negative inference, this slightly negative effect does not substantially outweigh the probative value of Troutman's identification. We find the evidence was properly admitted.

11

### E. The Trial Court Improperly Excluded Evidence of The Lawsuit by The Victims Against Mattingly.

The trial court improperly excluded evidence of the civil suit by Collier seeking money damages from Mattingly. A trial court's ruling on the limits of cross-examination is reviewed for abuse of discretion and we will uphold the ruling unless it is arbitrary, unreasonable, or unsupported by law.[9]

At trial, the defense was prohibited from cross-examining Collier about the lawsuit he had filed against Mattingly. The court sustained the Commonwealth's objection that the evidence had no relevance to deciding Mattingly's guilt or innocence.

Under KRE 403, the trial court has broad discretion in admitting evidence. But impeachment evidence tending to show bias is to be liberally admitted.[10] While bias is not relevant to guilt or innocence, it is relevant to the credibility of the witness's testimony. So, the trial court erred in prohibiting defense counsel from cross-examining Collier about the lawsuit he filed against Mattingly because it would have made the jury aware of any potential bias.

Still, the error was harmless. Collier was a victim of the shooting. The jury may have assumed his bias for that reason alone, regardless of a pending civil action for damages. And the lack of cross-examination about Collier's bias

---

[9] *Davenport v. Commonwealth*, 177 S.W.3d 763, 771 (Ky. 2005) (citing *Nunn v. Commonwealth*, 896 S.W.2d 911, 914 (Ky. 1995)).

[10] *Commonwealth v. Armstrong*, 556 S.W.3d 595, 600 (Ky. 2018) ("While no specific provision of the Kentucky Rules of Evidence provides for impeachment of a witness by bias, prejudice, or ulterior motives, we have always recognized that impeachment is permissible on cross-examination. Exposing a witness's bias or motivation to testify is 'a proper and important function of the constitutionally protected right of cross-examination[.]'").

resulting from the lawsuit is unlikely to have affected the outcome of the trial because multiple victims testified, and Collier's testimony only relayed events of which the jury had already been made aware. As a result, the error did not likely affect the outcome of the trial.

**F. There Was Sufficient Evidence of Mattingly's Prior Felony Convictions to Support His Conviction For Possession Of A Handgun.**

Mattingly argues there was insufficient evidence to support his conviction of possession of a handgun by convicted felon because the Commonwealth failed to introduce certified copies of his prior convictions. At his trial, a paralegal for the Commonwealth, testified about Mattingly's prior convictions. Certified copies of these prior convictions were later introduced in the sentencing phase of the trial.

The relevant testimony was as follows:

> Commonwealth: And you can only testify from the record that you have in front of you that you prepared, correct?
>
> Paralegal: Yes, that I prepared from certified records.

We have held that certified copies of prior judgments do not have to be introduced if a qualified witness testifies from relevant documents to prove a prior conviction.[11] For example, in *Finnell v. Commonwealth*[12] we found the trial court erred in allowing a probation officer to testify to the defendant's prior convictions based upon CourtNet records.[13] The accuracy of the records was

---

[11] *Commonwealth v. Mason,* 331 S.W.3d 610, 625, 631 (Ky. 2011).

[12] 295 S.W.3d 829, 832 (Ky. 2009).

at issue, and the officer was not testifying from certified court records of the defendant's prior convictions. So, the conviction was supported solely by unreliable evidence.

The circumstances in the present case concern no issue with accuracy of the convictions and, therefore, are distinguishable from *Finnell*. The testimony by the paralegal regarding Mattingly's prior convictions indicated she was relying on information from certified court records. The defense did not object to the convictions she testified to, but only that the records must be admitted into evidence. This is sufficient evidence for a reasonable jury to find that the defendant had been previously convicted. We therefore find no abuse of discretion in the trial court's ruling.

### G. The Commonwealth Properly Used Mattingly's Prior Felony Convictions at Trial and at Sentencing.

Mattingly contends that the Commonwealth improperly used a single prior conviction both to create an offense and enhance his punishment for that offense.

During the guilt phase of the handgun charge, the Commonwealth used Mattingly's prior Jefferson County conviction as proof of his status as a convicted felon. Later, in the penalty phase the Commonwealth used the same conviction as proof toward enhancing Mattingly's sentence as a PFO on the four counts of first-degree assault and one count of second-degree assault. The defense objected on grounds that the same prior conviction cannot be used

---

[13] *Id.*

14

toward both a charged offense and a sentence enhancement. But the trial court overruled the objection finding that because Mattingly was indicted on several charges, the prior conviction could be used to enhance his sentence on the other convictions.

We find no abuse of discretion because the Commonwealth's use of Mattingly's prior conviction was not improper. In Kentucky, a prior felony that was used to create an offense or enhance a punishment at trial of a second crime may not also be used to enhance the punishment under the persistent-felony enhancement statute.[14]

Here, Mattingly's prior conviction was properly used. The prior felony was used to prove the charge of felon in possession but was not used to also later enhance the punishment for his handgun-possession conviction. Instead, the prior felony was used to enhance the punishment for the four counts of first-degree assault and the one count of second-degree assault. The prior felony, therefore, was not used at a second trial to create an offense and enhance the sentence of the offense the prior felony created. Accordingly, we affirm the trial court.[15]

---

[14] *Oro-Jiminez v. Commonwealth,* 412 S.W.3d 174, 179 (Ky. 2013) (holding that it was permissible for a single prior felony conviction to establish the offense of possession of a handgun by a convicted felon and to enhance the first-degree robbery sentence under the PFO statute).

[15] Mattingly additionally contends there was insufficient evidence presented concerning his prior Indiana conviction; however, regardless, a single prior conviction may be properly used to both create an offense and enhance the defendant's sentence, so long as it is used toward a separate offense. *Oro-Jiminez,* 412 S.W.3d at 179.

The defense argues that during the guilt phase the Commonwealth failed to provide sufficient evidence of the prior felony because it did not indicate which specific felony was to be used to establish the offense at this second trial. We disagree, as this Court has never required that of the Commonwealth.

### H. The Commonwealth Properly Introduced a Summary Sheet of Mattingly's Prior Convictions That Was Prepared With Certified Records.

Mattingly argues the Commonwealth's introduction of a sheet summarizing his prior convictions was violative of the hearsay rule. The defense objected to the summary sheet at sentencing, claiming the sheet contained a misdemeanor conviction that was prejudicial and could not be considered. The trial court overruled this objection, finding that misdemeanor convictions can be considered during sentencing. Therefore, the potential hearsay issue was not preserved for appeal.

During the penalty phase, the Commonwealth introduced a document summarizing Mattingly's prior convictions through the testimony of a paralegal. This summary was admitted as Exhibit 52 and shown to the jury.

The defense contends on appeal the Commonwealth's summary sheet was an "investigative" document and therefore does not fall into any exception to the hearsay rule. But this trial exhibit was offered into evidence as compilation of certified records, to which the defense made no objection. Certified judgments are an exception to the hearsay rule, and summaries of large amounts of documents are generally permissible as an exception to the

16

hearsay rule.[16]  It is unclear if all the prerequisites of the hearsay exception for summaries of voluminous records were present, but the summary sheet contained minimal information and was admitted alongside certified copies of the defendant's prior convictions.  Any error that resulted from the introduction of the summary sheet was not palpable.

## CONCLUSION

For the reasons stated in this opinion, we affirm the judgment.

All sitting.  All concur.


COUNSEL FOR APPELLANT:

Michael Lawrence Goodwin

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Kristin Leigh Conder
Assistant Attorney General

---

[16] KRE 803(23) and 1006.