RENDERED:  OCTOBER 10, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1176-MR

WILLIAM DAVID STOKES                                         APPELLANT

                   APPEAL FROM TODD CIRCUIT COURT
v.             HONORABLE JOE W. HENDRICKS, JR., JUDGE
                         ACTION NO. 23-CR-00025

COMMONWEALTH OF KENTUCKY                         APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  COMBS, EASTON, AND LAMBERT, JUDGES.

EASTON, JUDGE:  William David Stokes ("Stokes") appeals his conviction after a jury trial for Third-Degree Sodomy.  He argues primarily that the circuit court erred in not allowing testimony about Stokes by a nurse who had examined him.  The circuit court excluded this testimony because it had not been disclosed prior to trial.  Other claims of error relate to a hearsay statement offered by the

Commonwealth and improper prosecutorial comments. Finding no actionable error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 26, 2023, Stokes was a deputy jailer employed at the Todd County Detention Center ("TCDC"). An inmate ("Oakley") was on that same date housed at the TCDC. At the trial, the Commonwealth proved to the satisfaction of a jury that Oakley performed oral sex on Stokes while the two men were alone in a small maintenance room in the TCDC on that afternoon. Because of the position of Stokes as a deputy jailer, the oral sex violated the law, even if consensual. KRS[1] 510.090(1)(e).

The focal evidence was the testimony of a kitchen worker who saw the act as she walked past the open door of the maintenance room. Circumstantial evidence also played a role in the conviction. Both sides offered evidence of the nature of prior interactions between Stokes and Oakley. Stokes presented himself as a caring man who often provided things for inmates out of kindness, while the Commonwealth argued Stokes was "grooming" inmates and seeing which ones might be willing to provide sexual favors for him. Other employees who worked at the TCDC provided information about the interactions.

---

[1] Kentucky Revised Statutes.

A third-party company ("Kellman") provided the food services for the TCDC on a contract basis with inmates assigned to assist. Ruby Taylor Williams ("Miss Ruby") was one of the kitchen employees with Kellman. Oakley was one of the inmate assistants. Miss Ruby told about interactions between Stokes and Oakley which she observed in the kitchen. On more than one occasion, Stokes had a small squeezable bottle of flavor enhancer for water. He would add this to Oakley's water in the kitchen. Miss Ruby did not see Stokes do this for others.

Believing that giving anything to inmates violated policy, Miss Ruby confronted Stokes. Stokes responded: "I don't need anybody watching me – what I do because I work here. I am a deputy here, and I can do what I do."[2]

Also specific to Oakley and Stokes was testimony from a medical worker at the TCDC about glasses. Oakley needed glasses, but he did not have money to pay for them. Stokes had escorted Oakley to the medical visit at the jail when Oakley discussed his need for glasses with the medical worker. Stokes offered to help Oakley pay for glasses. Stokes said that he was willing to pay for the glasses because Oakley was a hard worker. Rather than a more direct method of payment "on the books" at the TCDC, Stokes sent $50[3] indirectly to Oakley's sister just two days prior to the date at issue.

---

[2] Trial Day One at 3:42:32 – 3:43:06.

[3] It is not clear whether this would have been enough to buy a pair of glasses.

Jennifer Pearson ("Pearson") also worked for Kellman in the kitchen. She oversaw the inmates assigned to work in the kitchen. She had spoken with Stokes about allowing inmates to use vape devices in or near the kitchen with Stokes again insisting that there was nothing wrong with that. There was also information about Stokes getting salt from the kitchen because it could be used by inmates for gargling to relieve sore throats or other conditions. Pearson did not think it proper for inmates to use salt from the kitchen for this purpose.

Stokes presented Pearson as difficult to get along with and having an ax to grind against him. Pearson denied any animus toward Stokes. Pearson even referred to Stokes's wife (who also worked at the TCDC) by her nickname, which was reserved for friends. Any bias of Pearson was important because she was the person who testified that she saw the act of sodomy.

But Pearson's recollected observation was not the only evidence. The Commonwealth presented documents and videos about the events of that day. Much of the interior of the TCDC is monitored by cameras, including the hallway containing the entry to the maintenance room. Because of all the camera footage and documentation, the jury received a clear timeline of the events. We will next detail this evidence because we will assess the denial of Stokes's motion for a directed verdict.

On April 26, 2023, Oakley and a fellow inmate ("Jones") had been on maintenance duty with Stokes. This was recorded at 1:54 p.m. Precisely three hours later, an "all call" alert went out. This called for all deputy jailers to report to the upper deck of the facility. Stokes did not report there. Instead, video shows Stokes going to a laundry room and gathering Oakley and Jones.

Stokes takes these two inmates from the laundry room at the end of a hallway to the maintenance room in the middle of that same hallway. When they arrived at the maintenance room, Stokes sent Jones back to the laundry room while Oakley and Stokes went into the maintenance room. For a few minutes, the video shows Jones standing near the doorway of the laundry room or peeking out from time to time to view the hallway.

Then Pearson enters the hallway from the opposite end to the laundry room and walks toward the laundry room. Pearson had been on a break and was heading back to the kitchen. She was going to gather the inmate workers. Video shows Pearson walking past the maintenance room about mid-way in the hallway when she looks over and is able to see through the open door of the maintenance room. What Pearson sees causes a reaction with a pause before she continues walking toward the laundry room where Jones and others are waiting near the door.

The maintenance room is a small room with a partially obstructed view to the left as one looks in.  Pearson said that she saw Stokes sitting in a chair with his arms to the side.[4]  Oakley was on his knees in front of Stokes.  Pearson saw an open flap of Stokes's pants or that the pants were "bunched."  In other words, the pants did not appear to be closed.  But because of Oakley's position, Pearson could not say if the pants were unbuttoned.  Due to the angle presented, Pearson could see only the back and left side of Oakley's head, including his ear.  She observed an upward[5] motion of Oakley's head in the one or two seconds of her observations.  She did not see any contact between Oakley's mouth and Stokes's genitals.

When Pearson got to the laundry room at the end of the hallway, she met Jones and others who were laughing and talking.  She thought they were up to something.  As she approached, Jones said:  "You saw it, didn't you?"  Pearson then made a radio call to get the door at the end of the hallway opened for her and the inmates to get back to the kitchen.  Within one minute, while Pearson was still in the hallway, Oakley and Stokes exited the maintenance room, and Stokes then took Oakley back to the laundry room after Pearson was gone.

---

[4] There was discussion about the chair having arms, which it did not.  The point is that Pearson saw Stokes's arms to his side.

[5] There was some inconsistency of seeing an upward as opposed to a downward motion.  Of course, either way could be consistent with performing oral sex.

The video of Stokes before he went into the maintenance room showed him with his belt fastened and his shirt tucked in. When he left the maintenance room, his shirt was partially untucked. The top of Stokes's pants appears at least to be folded down. After Stokes enters the office where his wife works, he completely untucks his shirt and covers the top of his pants while his wife faces the other direction. The multiple video clips and angles tend to support the Commonwealth's argument that the pants were unbuttoned after Stokes left the maintenance room.

Pearson had a difficult decision to make about reporting what she had seen. She feared losing her job. It could cause trouble for her husband who also worked at the TCDC. But she could not ignore that a crime had occurred. The stress of the decision caused Pearson to become tearful even at the trial. She decided she must report the incident. She reported it that same afternoon.

All the video removed any serious question about the timing of the events. Yet when his employer asked Stokes to record his hours for that day, Stokes claimed to have stopped working at 3:55 p.m. (just after the "all call" and before the several minutes of the interaction with Oakley in question), even though Stokes clearly left after the event and after 4 p.m.[6] After the initial, immediate

[6] The Commonwealth argued that the misstatement of Stokes's hours for that day was suspicious and was an attempt to create evidence that Stokes was not there despite the numerous video indications of the time. Stokes did not advance an argument that being "off the clock" somehow

investigation, the jailer fired Stokes. Stokes did not return to work at the TCDC after April 26, 2023. We will detail further information as needed for our following analysis.

## STANDARD OF REVIEW

"On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). "In reviewing the exclusion of expert witness testimony, this Court applies an abuse of discretion standard." *Jackson v. Ghayoumi*, 419 S.W.3d 40, 43 (Ky. App. 2012). "The trial court has discretion to control the presentation of evidence. In the absence of any abuse, the reviewing court will not reverse the decision of the trial judge." *Pendleton v. Commonwealth*, 685 S.W.2d 549, 554 (Ky. 1985). Generally, "[t]he standard of review of an evidentiary ruling is abuse of discretion." *Cox v. Commonwealth*, 553 S.W.3d 808, 814 (Ky. 2018). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair or unsupported by sound legal principles." *Woodard v. Commonwealth*, 147 S.W.3d 63, 67 (Ky. 2004).

---

affected his position as a deputy jailer thus removing his conduct from the prohibition of the statute.

-8-

When a claimed error has not been properly preserved for our review, we review for palpable error. An error is palpable where it is "easily perceptible, plain, obvious and readily noticeable." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). Such an error will justify relief only when a manifest injustice will occur if the relief is not granted. RCr[7] 10.26. Manifest injustice requires "showing [a] probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006). "Manifest injustice is found if the error seriously affected the fairness, integrity, or public reputation of the proceeding." *McGuire v. Commonwealth*, 368 S.W.3d 100, 112 (Ky. 2012).

## ANALYSIS

Stokes believes that the circuit court effectively denied him a defense when it did not allow him to call a nurse to testify about his physical condition. The nurse was going to explain the medical basis for a claim of impotence and the retracted position of Stokes's genitals when he was seated to support an opinion that Oakley could not have performed oral sex on Stokes. The circuit court excluded this evidence because Stokes had not disclosed it pursuant to the circuit court's application of its Arraignment Order.

---

[7] Kentucky Rules of Criminal Procedure.

To assess this ruling first requires a decision as to whether the evidence offered was from an expert witness or a lay witness. The offered testimony was as an expert witness. Stokes tried to draw a lay-witness line at the simple measurements made of him, but even in this context, the witness spoke in terms of the impact of the "mons pubis" and the mechanism of retraction of the penis.

With respect to discovery, Stokes generically requested discovery from the Commonwealth at arraignment. The circuit court then entered a standard Arraignment Order which directed the Commonwealth to "provide discovery as fully as permitted by the Criminal Rules . . . ."[8] The record shows that the Commonwealth fully complied with its duty and provided discovery on more than one occasion prior to trial. The Arraignment Order further makes clear that "by accepting this discovery defendants, [sic] shall be deemed to have requested it and shall be subject to reciprocal discovery." Stokes did not turn over the results of the nurse's examination or even her identity as a witness until after the Commonwealth had closed its case, and Stokes was called upon to present his defense at the trial.

---

[8] Record at Page 25.

Stokes's argument about his failure to disclose this information is based on the language of RCr 7.24. The rule speaks in terms of a "written request" to the Commonwealth if a report of any physical examination or expert witness information is sought. RCr 7.24(1)(b), (c). According to Stokes, only if this occurs, is a defendant obliged to turn over its similar materials also upon written request. RCr 7.24(3)(a). The Commonwealth did not disclose any expert witnesses and did not call one at trial.

RCr 7.24 was not intended to tie the hands of the trial courts as to discovery practice. The circuit court has discretion to direct discovery. RCr 7.24(6); *Commonwealth v. Nichols*, 280 S.W.3d 39, 42-43 (Ky. 2009). Reciprocal discovery is an important tool for both sides. Proper disclosure avoids continuances and unfair surprises. One commentator has noted that local rules may direct disclosure without the written demand requirements of RCr 7.24. KYTRHB[9] § 9:14, *Discovery Under RCr 7.24*, n.3. Unless an abuse of discretion is shown in the terms imposed, a circuit court may similarly direct discovery disclosure by order.[10]

---

[9] Kentucky Handbook Series, Trial Handbook for Kentucky Lawyers.

[10] To prevent confusion or misunderstanding, an order directing discovery might serve all concerned better if it briefly summarizes RCr 7.24 or refers to its subsections and clearly indicates that the results of examinations and identity of expert witnesses must be disclosed even if the other side does not have any to disclose.

This does not mean that the Commonwealth can demand more than RCr 7.24 subjects to disclosure. The Commonwealth in the present case could insist on the results of examinations and at least the identity of an expert witness, but it was not entitled to a report generated by the expert as to her opinions. *Nichols*, *supra*, at 45. We find no abuse of discretion here in the refusal to allow the lately disclosed evidence.

We also conclude that the circuit court did not abuse its discretion in disallowing the expert evidence even if the Arraignment Order had not justified the exclusion. Stokes provided the evidence offered through avowal, and so we have the benefit of it for review. Expert testimony is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue[.]" KRE[11] 702. Stokes presented other evidence regarding his condition. Granted, the evidence about impotence was from Stokes's wife, and the opinion of a non-biased expert may have carried more weight. But the law does not require an erection for oral sodomy to be committed. It requires contact only. KRS 510.090; KRS 510.010(1).

As to Stokes's physical dimensions, the jury could see him. They saw him stand and sit repeatedly. The jury could also consider the testimony about Stokes's leaning back during the event as illustrated by Pearson in her testimony.

---

[11] Kentucky Rules of Evidence.

The jury could evaluate the likelihood of contact with his genitals when he was in a seated position without the need for specific measurements or an expert opinion.

Curiously, the ability of the jury to observe Stokes was an issue during the questioning of Mrs. Stokes. She had explained that the waist of Stokes's pants would often flip down when he got up from a seated position which would explain what Pearson saw and what the videos showed. When the prosecutor pointed out that this had not occurred during the trial, Mrs. Stokes said that Stokes was now wearing a different belt than the one he wore on the day of the alleged sodomy, and that is why no one observed this during the trial.

The more troubling evidentiary question is presented by the hearsay statement by the inmate about what Pearson saw.[12] A question mark at the end of a sentence does not transform an otherwise hearsay statement into non-hearsay. A question may contain a hearsay assertion. *Harris v. Commonwealth*, 384 S.W.3d 117, 126-29 (Ky. 2012). The statement of "you saw it, didn't you?" has a hearsay component. It asserts that the speaker knew what "it" was. This is arguably consistent with a conclusion that Jones knew what was happening in the maintenance room and was acting as a lookout while Oakley performed oral sex on Stokes.

_____

[12] The presentation of this statement in context is recorded at Trial, Day Two, at 11:01:52-11:03:33.

Stokes timely objected to this statement. The court allowed the evidence saying that the Commonwealth did not offer the statement for the truth of the statement itself. The question the Commonwealth had asked was whether anything had been said which would alert someone down the hall to Pearson being present. The prosecutor followed this ruling with more questions designed to explain what people down the hallway could hear. Stokes and Oakley exited the maintenance room just after this statement was made. The hearing of the statement itself could explain why Stokes and Oakley exited the room when they did, which is relevant for the factfinder to consider when assessing if there could have been some innocent reason for the men to have been alone in the maintenance room.

There was a further suggestion that Stokes would have been able to hear Pearson calling on the radio to open the door at the end of the hallway. We will return to this assertion when we evaluate the claim that the Commonwealth improperly commented on Stokes's silence during the trial. But for now, we can accept that the statement made to Pearson in the hallway had a proper non-hearsay purpose.

The circuit court discussed the statement by Jones and stated its ruling that the Commonwealth did not offer it for the truth of the statement itself within the hearing of the jury. The questions which followed did not stray from that

limited purpose. The potential problem developed when the prosecutor came close to arguing an improper hearsay use during the closing argument.

During his closing argument, the prosecutor told the jury that it did not require a genius to figure out what Jones and the other inmates were talking and laughing about, basically that oral sex was being performed in the maintenance room.[13] This harkens back to the statement by Jones about Pearson seeing "it." But Stokes did not object to this statement during the closing argument. Thus, Stokes did not preserve any error. Examining this for palpable error, we find none. In the context of the other evidence, we do not believe this isolated comment, which only arguably infers an impermissible hearsay purpose for the statement, was anywhere near being flagrant prosecutorial misconduct so as to amount to palpable error. *Bowling v. Commonwealth*, 553 S.W.3d 231, 242-43 (Ky. 2018).

With respect to the directed verdict motion, the motion was insufficient to preserve the question for our review. The motion was stated in a matter of seconds and just asserted a general insufficiency of the evidence, even though the circuit court asked Stokes's counsel if he wanted to state specific grounds.[14] A directed verdict motion must address specifically what element the Commonwealth has failed to prove. *Ray v. Commonwealth*, 611 S.W.3d 250, 266

---

[13] Trial, Day Three, at 2:41:10-2:42:05.

[14] Trial, Day Two, at 3:25:18-42.

(Ky 2020). A defendant may not just make a perfunctory statement that the evidence is generally inadequate.

Even if we examine the evidence for its sufficiency, we conclude the circuit court properly denied the motion. There was clearly sufficient evidence for the jury to decide the question of whether the sodomy occurred.

Stokes finds it incredible that a conviction could result from a one or two second glance by Pearson. Ignoring the other circumstantial evidence, Stokes also claims that Pearson was incredible, as evidenced by statements she made about her uncertainty about what she had seen. For example, Stokes presented evidence that Pearson did not remember telling the investigating officer that for all she knew Oakley was just making a downward or upward motion with his head because he was "checking for a bug."[15]

This was obviously an unfortunate use of sarcasm. Pearson repeated such sarcasm during the trial when she said that for all she knew Oakley was "making bread."[16] Despite the sarcasm, Pearson was certain that she saw Oakley performing oral sex on Stokes. Pearson insisted: "I was sure, and I still am very sure."[17]

---

[15] Trial, Day Two, at 2:44:15-2:45:05.

[16] Trial, Day Two, at 11:32:49-51.

[17] Trial, Day Two, at 11:26:10-21.

There being sufficient evidence to sustain the conviction, we must finally examine claims of prosecutorial misconduct other than the possible hearsay reference in the closing argument which we have already rejected.  Ultimately, we find no actionable error individually or cumulatively.

During the opening statement, the prosecutor made a five-second comment stating that he had no idea where Oakley was and that perhaps Oakley "was out on the open sea with the flavor of the month."[18]  Stokes did not object to this statement.  He believes this was an improper insinuation of Oakley being a homosexual, which could be relevant in assessing whether oral sodomy occurred.

First, attorneys do not testify in opening statements; they are to tell the jury what the evidence will be.  It could be anticipated that Oakley's absence would be a curiosity to the jury.  The Commonwealth could have had a witness explain efforts to find Oakley, but the prosecutor is not permitted to testify as to his personal knowledge of where someone is.  It was eventually Mrs. Stokes who testified that Oakley was released from the TCDC within a week of the event involving Stokes, with Oakley being transferred to Christian County.  Apparently, no one could offer any further information about where Oakley was at the time of the trial.

---

[18] Trial, Day One, at 2:33:36-41.

The comment about "the flavor of the month" does not imply sexual orientation. This modern slang expression refers to someone or something currently popular. Synonyms are "the latest thing, fashionable, in vogue, all the rage."[19] We do not believe this comment by the prosecutor in the opening statement constitutes any error calling for corrective action.

In the closing argument, the prosecutor referred to Oakley as the "boyfriend" of Stokes. Again, Stokes did not object. The law allows a great deal of leeway in a closing argument. Considering the evidence presented, it was not beyond the pale for the prosecutor to suggest a relationship between Stokes and Oakley. There was no error in this statement, much less a palpable one.

We also find no need to comment at length on the contention that the prosecutor appealed to passion when he made comments about the "truth being under attack today" and the position the defense had taken to question what Pearson had seen and to excuse improper conduct. These comments were in no way unfair and certainly do not rise to the level of a reversible error as a comment not objected to by the defense. *See Barnes v. Commonwealth*, 91 S.W.3d 564 (Ky. 2002) (prosecutor's argument that an acquittal would be worse than murder required reversal).

---

[19] COLLINS DICTIONARY at collinsdictionary.com (last accessed Sep. 23, 2025).

Finally, we must address the alleged comment by the prosecutor on the silence of Stokes during the trial. In the closing argument, the prosecutor referred to the evidence he presented as "the only evidence you heard about what happened in that room." He further commented on the radio traffic and said: "Nobody said Billy heard her [Pearson] on the radio" as a possible explanation for why Stokes left the maintenance room when he did. Stokes did object to this statement.

Although perhaps uncomfortably close to a comment on a defendant's silence, the prosecutor did not actually cross the line. The comment was an indirect reference to what a defendant might have been able to tell the jury. The prosecutor here did not say that *only* Stokes could have provided evidence about this and thus his silence should be used against him.

Witnesses other than Stokes could have been called to explain who had the "walkie-talkies" and whether the settings of those devices would have enabled Stokes to hear what Pearson said in the hallway. Even without Oakley as an available witness, Jones, or any of the other inmates with knowledge of the events could have been called to explain what people can hear in the hallway. Witnesses other than Stokes could have been called to offer evidence of some innocent reason for Stokes to have Oakley in the room alone with him. For example, a need for a maintenance crew at the relevant time could have been

shown through other witnesses. The prosecutor here did not improperly comment specifically on Stokes's silence. *Ragland v. Commonwealth*, 191 S.W.3d 569, 588-91 (Ky. 2006).

## CONCLUSION

The Todd Circuit Court did not abuse its discretion in its evidentiary rulings, nor did it permit improper arguments by the Commonwealth. Given the evidence presented, Stokes was not entitled to a directed verdict. The Todd Circuit Court is **AFFIRMED**.

LAMBERT, JUDGE, CONCURS.

COMBS, JUDGE, CONCURS IN RESULT ONLY.

BRIEFS FOR APPELLANT:

William G. Deatherage, Jr.
Hopkinsville, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Kristen L. Conder
Assistant Attorney General
Frankfort, Kentucky