RENDERED: DECEMBER 14, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0185-MR

RUBEN JOHNSON, IV                                                                       APPELLANT

V.

ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE MARY SHAW, JUDGE
NO. 21-CR-000724

COMMONWEALTH OF KENTUCKY                                               APPELLEE

**OPINION OF THE COURT BY JUSTICE CONLEY**

**<u>AFFIRMING IN PART AND REVERSING IN PART</u>**

This case comes before the Court on appeal as a matter of right[1] by Ruben Johnson, the Appellant, from the judgment and sentence of the Jefferson Circuit Court. Johnson was convicted of first-degree robbery; complicity to first-degree robbery; first-degree assault; fourth-degree assault; two counts of first-degree strangulation; third-degree terroristic threatening; and two counts of intimidating a participant in the legal process. He now appeals arguing the trial court abused its discretion by admitting evidence of three prior misdemeanor convictions as rebuttal character evidence and in admitting the testimonial hearsay statements of a witness; alleging error when the trial court failed to direct verdicts for both counts of first-degree robbery and one count of intimidating a participant in the legal process; and alleging

---

[1] Ky. Const. § 110(2)(b).

error when the trial court failed to poll the jury. We affirm the trial court on all counts except that Johnson was entitled to a directed verdict on the count that resulted in his conviction for complicity to first-degree robbery.

## I.    Facts

There are two incidents involved in this case, one stemming from December 26, 2019, and the other from January 25, 2020. Johnson was in a relationship with Cheryl Martin, who had two children. On December 26, Martin drove Johnson along with her sister, Latasha Martin, and Johnson's friend, Theras Pettis, to her apartment. Cheryl had to work and left her two children with the other three. On her break, she called her sister to check on the kids. She heard Johnson and Latasha screaming and arguing. Latasha, Pettis, and Johnson had all been drinking. Cheryl left work to go home.

When she arrived, although the confrontation between Latasha and Johnson had settled down, Cheryl ordered Johnson and Pettis to leave, and threatened to call the police. Cheryl took her kids to the store for approximately one hour to give Johnson time to go. But when she returned Johnson was still there and had invited other friends to come over. At some point, Cheryl confronted Johnson with her phone in her hand and Johnson took her phone, then grabbed Cheryl by the throat and lifted her off the ground. Cheryl could not breathe, and her vision started to blur. Johnson then dragged Cheryl outside the apartment and threw her down the hallway stairs. Cheryl was so dazed by the impact she could not get up. Johnson followed her to continue the attack, but Latasha intervened and pulled on Johnson's jacket in an attempt to

2

hold him off. Johnson's friends, though none were specifically identified, grabbed at Latasha to stop her. One of these unidentified friends also took her phone. Johnson proceeded to throw Cheryl down another flight of stairs.

Cheryl's phone was stomped on and broken, though it was recovered in the grass outside the apartment building after a phone call was made to it. Latasha's phone was never recovered. The two sisters had a neighbor call the police for them. Johnson's brother came to pick him and his friend up before the police arrived. Johnson threatened to kill Cheryl as he was leaving.

When police arrived they offered to take Cheryl to the hospital, but she did not want to leave her children. She informed the police about the incident and got an interpersonal protective order (IPO) taken out against Johnson. Although she tried several times to have the IPO served, it never was. Cheryl told Johnson about the IPO, but he disregarded it. He continued to visit Cheryl, and Cheryl testified that she thought it best not to resist Johnson to protect herself and her children.

From this December incident, an indictment would later issue: two counts of robbery in the first degree; strangulation in the first degree; two counts of intimidating a participant in the legal process; two counts of assault in the fourth degree; and two counts of terroristic threatening in the third degree.

On January 25, 2020, another attack occurred. It must be noted that Cheryl admits she has little memory of the night in question. It began with her driving Johnson to his apartment. While there, some neighbors came to visit.

3

Cheryl made everyone a drink, and subsequently she and Johnson used cocaine. Johnson's testimony was that after leaving his apartment, Cheryl and he took a neighbor to the grocery store. Afterward, he and Cheryl had dinner and he purchased what he believed was marijuana but was later discovered by Johnson to be a synthetic copy known as spice. The two then went to Cheryl's apartment. At her apartment, the kids were told to go to their room while Cheryl and Johnson smoked the spice. Johnson's account of the subsequent events is that he eventually went to bed, but Cheryl woke him up because she wanted more cocaine. Johnson admitted to slapping her and then restraining her from leaving the apartment by grabbing her around the neck, as she was going to get more cocaine. Johnson also admits Cheryl told him she couldn't breathe at which point he released her. Johnson then went to use the bathroom. When he came out, he saw the apartment door closing. He went outside the apartment at which point he discovered Cheryl at the bottom of the flight of stairs. He proceeded to help her back into the apartment, passing a neighbor, Sheena Pittman.

After getting Cheryl into the apartment, Johnson testified, he got a towel to clean up her injuries. Eventually, Johnson noticed a police officer shining a light through the apartment window. Pittman had called the police to report a domestic dispute. The response time of the police was only a couple minutes. Body camera footage from one of the officers shows they were let in the apartment building by Pittman. Police knocked multiple times and announced who they were. The police noted blood on the stairwell and on the outside of

4

Cheryl's apartment door. One officer heard moaning from inside her apartment. While this was occurring, Officer Huber interviewed Pittman. That interview was captured on his body camera and was played at trial. Pittman told Officer Huber that when she passed Cheryl and Johnson on the steps, Cheryl reached out to her. Johnson told Pittman Cheryl fell down the steps, but Pittman told Officer Huber that Cheryl did not fall, and that she did not think Cheryl was intoxicated at the time.

The police continued knocking and debated whether to kick down the door. By the time eight minutes had elapsed since their arrival, Officer Martin-—promoted to detective by the time of trial—opened a hallway window and went out onto the balcony to get a view inside the apartment. He relayed what he saw to his fellow officers. He saw a woman lying on the ground and Johnson was on top of her. He noted knots on her face, a black eye, and blood. She appeared to be breathing from her mouth and Officer Martin did not think she was in a condition to speak. He also saw blood on Johnson's pants and noted that Johnson was attempting to move Cheryl out of his view.

Johnson refused to open the door for the police. At first, he told officers he did not want to open the door because he had been using drugs. He was told that did not matter as they were concerned about Cheryl and that emergency services were waiting to check her out. Johnson still refused and said nobody had called the police. Officer Martin corrected him, but Johnson still refused to open the door.

5

At this point, fifteen minutes had elapsed since the arrival of the police. A police sergeant arrived at the scene and was communicating with Johnson through the window. He had noted Cheryl was lying face down and appeared unresponsive. Based on his observations, he ordered Officer Huber to kick down the door. Notably, Johnson began complaining that the police would have to pay for the door. Johnson was detained, apparently arrested, and taken to a police vehicle by Officer Huber. Officer Huber testified to telling Johnson to stop talking, as Johnson would not stop complaining, stating the police had to pay for the door; that nobody had called them; and that Cheryl had only fallen down the stairs. Johnson was then taken to the police station.

Cheryl's injuries at the apartment were noted as her left eye completely swollen shut; knots on her forehead; bleeding from her nose and mouth; marks on her neck; and she had urinated on herself. Cheryl's own testimony was that she had no memory of the actual attack save for one: that Johnson was holding her down across his legs, hitting her multiple times on her left side and throat. At the hospital, Cheryl was treated by Dr. Daniel O'Brien, who has worked in emergency medical care since 1985. Dr. O'Brien testified that Cheryl would likely have died without emergency medical aid. He noted her injuries to her face were a "very violent trauma" resulting in swelling and contusions around her left eye, left cheek, mouth, jaw, and ear. CT scans of her back and neck showed significant blood accumulation and a crack in the back of her skull, which Dr. O'Brien noted is a particularly hard bone to break. Dr. O'Brien also testified to ligature marks on Cheryl's neck which, when he was informed she

had urinated on herself at the scene, led him to conclude she had been strangled.

Despite being treated in the hospital, Cheryl's injuries continued to get worse for a time. Her throat and larynx swelled to the point that her airway was closed, and she had to be intubated. In all, she was in the hospital for six days. Nurse Yazel, who worked for the hospital as the Sexual Assault Forensic Examiner, performed her examination a day after Cheryl had been admitted. Her testimony largely corroborated Dr. O'Brien's. Yazel testified that Cheryl did have some injuries consistent with a fall, including her injuries on her right hand, elbow, foot, and knee. She testified, however, that her injuries to her eyes, lips, and neck were not consistent with a fall. She also stated that the sheer number of injuries to Cheryl could only have come from multiple impacts. Dr. O'Brien testified that he would be "very surprised" to see these kinds of injuries as a result of simply passing out and falling down the stairs.

This incident led to the following charges: criminal attempt murder; assault in the first degree; strangulation in the first degree; and terroristic threatening in the third degree.

Both incidents were the subject of one indictment and trial. During trial, Johnson was cross-examined as to whether he had ever been convicted of three misdemeanor batteries in Indiana. Body camera footage from Officer Huber was played which partially showed his interview with Pittman and her statements made therein. At the conclusion of evidence, Johnson sought directed verdicts on several charges but particularly the first-degree robbery charge and fourth-

7

degree assault charge related to Latasha Martin from the December 26, 2019, incident, as well as the first-degree robbery charge and intimidating a participant in a legal proceeding charge related to Cheryl Martin from the same day. Finally, after the jury had pronounced its guilty verdict, Johnson was asked if he desired to poll the jury. He now argues that he did invoke that right contrary to his counsel's statements to the trial court that polling was unnecessary. We address each of these in more detail below.

As to the December 2019 incident, the jury found Johnson guilty of first-degree robbery for the taking and destruction of Cheryl's phone; complicity to first-degree robbery for the taking of Latasha's phone which was never recovered; first-degree strangulation; intimidating a witness in a legal process regarding Cheryl; fourth-degree assault regarding Cheryl; and terroristic threatening regarding Cheryl. Regarding the January 2020 incident, the jury found him guilty of first-degree assault and first-degree strangulation. The jury recommended various lengths of prison for each guilty count, the highest being twenty years for the first-degree assault, and recommended all sentences run concurrently for a total of twenty years. The trial court imposed the sentence.

On appeal, Johnson has four arguments. First, that the trial court erred in allowing the Commonwealth to ask him about his three prior misdemeanor convictions for battery. This argument is further subdivided into three parts—that criminal convictions for violent crimes do not rebut character evidence for generosity; misdemeanor convictions are improper rebuttal evidence under

8

KRE[2] 405; and KRE 608 prohibited the Commonwealth from impeaching Johnson with the misdemeanor convictions. Second, Johnson argues the trial court erred in denying directed verdicts for both counts of first-degree robbery and one count of intimidating a witness in a legal proceeding (Latasha). Third, Johnson's right to poll the jury was violated. Finally, that the trial court erred in admitting the body camera footage showing Officer Huber's interview with Sheena Pittman, whose statements were testimonial hearsay.

For the following reasons, we conclude the questions regarding the three misdemeanor convictions was not error. The admittance of Pittman's hearsay statements via body camera footage was not a constitutional error and was harmless error. There was no error in not polling the jury. We affirm the trial court's denial of directed verdicts except for the first-degree robbery charge, which led to the conviction for the lesser-included complicity to first-degree robbery, regarding Latasha Martin.

## II.    Analysis

### A. No Palpable Error in Discussing Three Misdemeanor Convictions

Appellate courts generally review evidentiary rulings for an abuse of discretion. *Cox v. Commonwealth*, 553 S.W.3d 808, 814 (Ky. 2018). When an objection is not properly preserved the review is for palpable error. *Webb v. Commonwealth*, 387 S.W.3d 319, 329 (Ky. 2012). A palpable error is one that substantially effects the rights of the defendant and "manifest injustice has

---

[2] Kentucky Rules of Evidence.

9

resulted from the error." RCr[3] 9.26. "To discover manifest injustice, a reviewing court must plumb the depths of the proceeding . . . to determine whether the defect in the proceeding was shocking or jurisprudentially intolerable." *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky. 2006).

In this case, when the Commonwealth notified the trial court it desired to ask Johnson about the three misdemeanor convictions to rebut Johnson's testimony of being kindhearted, defense counsel only stated "I would object for the record to that coming in." There was no argument, no grounds stated, nor did defense counsel even ask for a ruling. Generic objections like this are generally disfavored "in fairness to the party offering the evidence and to give the trial court the opportunity to remedy any errors in the proceedings." *Winstead v. Commonwealth*, 283 S.W.3d 678, 688 (Ky. 2012). The defendant's interest is to have errors avoided or remedied during trial to prevent a potentially tainted conviction. When objecting to the admission of evidence, the defendant "must be specific enough to indicate to the trial court and this court what it is he is objecting to." *Bell v. Commonwealth*, 473 S.W.2d 820, 821 (Ky. 1971). He must also "insist that the trial court rule on the objection, or else it is waived." *Id.* We conclude the generic objection at trial was insufficient for preservation, but we will examine the issue under a palpable error review.

During direct examination, Johnson asserted that he was a "kindhearted person." On cross-examination the Commonwealth once again asked him to confirm that he had testified to being a kindhearted person. Johnson affirmed,

---

[3] Kentucky Rules of Criminal Procedure.

stating "Yes, I am." The Commonwealth asked to approach the bench. At the bench conference the Commonwealth declared that it intended to ask Johnson about his prior battery convictions out of Indiana to rebut the assertion to kindheartedness. When questioning resumed, the following colloquy occurred:

> Commonwealth: So, you are a kindhearted person?
>
> Johnson: Yes, ma'am.
>
> CW: And yet, you have been convicted of battery or domestic battery three times?
>
> J: I've been convicted of it three times?
>
> CW: Two battery convictions and one domestic battery conviction, isn't that right?
>
> J: Uh, excuse me.
>
> CW: You have been convicted of battery two times and you have been convicted of domestic battery one time out of Indiana, is that correct?
>
> J: Uh, yes.

Johnson first argues that evidence of prior acts of violence in and of themselves are not proper rebuttal evidence because violence does not rebut generosity. Citing Vito Corleone from the 1972 film *The Godfather*, Johnson argues a violent person can also be generous. Johnson testified he was a "kindhearted person," and did illustrate that kindheartedness with the example of freely giving drugs to fellow drug-users, so in that sense one might argue he was generous. But the specific words used at trial were "kindhearted" and generosity is a subset of kindheartedness, not equal to it. Kindhearted is defined as "having or showing a kind heart; kindly." I *The American College*

11

*Encyclopedic Dictionary*, Kindhearted, 672 (1952). Kindly is defined as "benevolent disposition or spirit." *Id.* Benevolent, finally, is defined as "desiring to do good for others." *Id.* at 114. From these definitions we see that a claim to be kindhearted is a broad one of general moral character and encompasses virtually all specific traits of good character. Therefore, to rebut a claim of kindheartedness, reputation for violence or specific acts of violence is permissible subject to the Rules of Evidence. As Professor Lawson observes, "[i]f an accused exercises this initiative [to put character in issue] with proof of general moral character, there is no obvious reason for disallowing evidence of a relevant specific trait in rebuttal, for the rebuttal evidence would narrow rather than broaden the character issue raised by the accused[.]" Robert G. Lawson, *The Kentucky Evidence Law Handbook*, (5th ed. 2013) § 2.20(2)(c).

Johnson also argues asking about the three misdemeanor convictions violated KRE 405 and KRE 608. The Commonwealth responds by ignoring that argument, and instead asserting the three misdemeanor convictions for battery are admissible under KRE 404(b). We conclude the controlling rule is curative admissibility. A correct evidentiary ruling by the trial court will not be reversed even if made for the wrong reasons. *Lopez v. Commonwealth*, 459 S.W.3d 867, 875 (Ky. 2015). And we can affirm a trial court for any reason appearing in the record. *Gasaway v. Commonwealth*, 671 S.W.3d 298, 311 (Ky. 2023). But it is worth reiterating that because of the generic objection made at trial, the trial court never articulated any reason for allowing the three battery convictions to be discussed.

12

As noted, the claim to be kindhearted is a broad one of general moral character. Proof of general moral character is allowed by KRE 404(a)(1) if the defendant initiates. But there are limits to the method by which general moral character may be proven.

> [T]he law does not permit an accused to prove good character by making sweeping statement [sic] about his or her general virtue and morality ("I have never committed a crime in my life," "I have never been in trouble with the law," "I am an honest person," etc.). When an accused (violating this prohibition) makes such statements, he/she puts character for substance in issue and opens the door to rebuttal by the prosecution.

Lawson, *supra*, at §2.20(2)(d). When a defendant strays beyond the limits, "specific acts that would not be admissible to prove character may be admitted into evidence in rebuttal of the claim of personal virtue and high morality." *Id.* at §2.25(3)(c).

Although Prof. Lawson does not frame it in such terms, the rule he describes is curative admissibility. "[W]hen one party introduces improper evidence, such 'opens the door' for the other party to introduce improper evidence in rebuttal whose only claim to admission is that it explains or rebuts the prior inadmissible evidence." *Metcalf v. Commonwealth*, 158 S.W.3d 740, 746 (Ky. 2005).

In *Stansbury v. Commonwealth*, the defendant was on trial for attempted murder of his fiancée. 454 S.W.3d 293, 296 (Ky. 2015). The Commonwealth asked the victim about her caring for her pets. *Id.* at 300. "His [Stansbury's] counsel asked Falconer [the fiancée] whether Stansbury had ever fed the pets." *Id.* She responded that he had. The Commonwealth on re-direct then inquired

13

as to how Stansbury treated the pets. She testified about his generally abusive conduct towards the pets such as beating them. *Id.* We held that conduct towards the pets was excludable as inadmissible character evidence, but by asking whether he had ever fed the pets, Stansbury "opened the door to the introduction of 'good' character evidence, [and] he cannot complain if the Commonwealth walked through that door and introduced character evidence not to his liking." *Id.* at 301.

> *Stansbury* did not cite to any Rule of Evidence, but the rules do state,
>
> > [o]n cross-examination of a character witness, it is proper to inquire if the witness has heard of or knows about relevant specific instances of conduct. However, no specific instance of conduct may be the subject of inquiry under this provision unless the cross-examiner has a factual basis for the subject matter of the inquiry.

KRE 405(b). In *Johnson v. Commonwealth,* 105 S.W.3d 430, 441-42 (Ky. 2003) and *Commonwealth v. Higgs,* 59 S.W.3d 886, 894 (Ky. 2001), we cited to KRE 405(b) as supporting the curative admissibility rule. In *Johnson,* the Court stated in dicta that the daughter's direct testimony that she had never "seen her dad have any illegal drugs in the house" opened the door for the Commonwealth to rebut that testimony on cross-examination by asking her if she knew he had pled guilty to a prior drug offense, despite the trial court having excluded that evidence prior to trial. *Johnson,* 105 S.W.3d at 441-42. In *Higgs,* the defendant's father testified on direct that he did not believe his son was a thief, "which amounted to an opinion of Appellee's good character for honesty." *Higgs,* 59 S.W.3d at 894. "The effect of the information elicited on cross-examination was that, at least as recently as the summer of 1995, he did

14

believe Appellee was a thief." *Id.* The Court resolved the issue specifically on the grounds of KRE 405(b) and curative admissibility. *Id.* at 894-95. We also clarified that "the target of this kind of impeachment evidence is the credibility of the character witness, not the prior conduct of the defendant." *Id.* at 895.

It should be noted, however, that credibility here is not to the truthfulness per se of the character witness, but rather the basis of the witness' testimony. For example, if a witness testifies that a defendant is an honest person, the Commonwealth may ask whether the witness knew the defendant had committed specific instances of dishonest acts. If the witness answers "yes," then the credibility of his testimony is undermined because it would seem contrary to an acknowledged fact. If he answers "no," then the credibility is undermined because the witness then appears to be uninformed. *See* Lawson, *supra,* at §2.25(4)(a). There is certainly a danger here for the defendant as specific acts of criminal conduct especially can be prejudicial, and Prof. Lawson does state KRE 403 would still be a basis for objection, even under the rule of curative admissibility. *Id.* But, as the Supreme Court of the United States noted in its seminal opinion *Michelson v. United States,* "[t]he price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him." 335 U.S. 469, 479 (1948).

KRE 405(b) and curative admissibility should not be conflated. Instead, the general rule of curative admissibility is that when a party opens the door

15

with inadmissible testimony, the opposing party may rebut that testimony with inadmissible evidence in kind, *Stansbury*, 454 S.W.3d at 300; and KRE 405(b) allows for that rebuttal to include inquiry into specific instances of conduct the testifying witness "has heard of or knows about" so long as the specific instances of conduct are relevant and the party inquiring "has a factual basis for the subject matter of the inquiry." KRE 405(b).

In this case, Johnson testified to being kindhearted, i.e., having a great disposition to do good. The prior acts of violence—of which the three misdemeanor convictions are evidence of—were relevant to rebut that assertion. The convictions being public record, the Commonwealth obviously had a factual basis for the inquiry. Accordingly, we find no error in the Commonwealth asking Johnson on cross-examination if he had been convicted of three misdemeanor convictions for battery.

### B. Admittance of Footage of Pittman's Statements Not Error

As related in Section I, Pittman was a witness to the January incident, or at least a portion of it, and she was interviewed by Officer Huber when the police responded to the scene. Part of her statements in the body camera footage were played at trial. A motion in limine excluding hearsay statements in body camera footage had been granted by the trial court prior to trial, and an objection on Confrontation Clause and hearsay grounds was made at trial prior to the body camera footage being played. The issue is preserved.

16

The dialogue from the body camera footage, as played at trial,[4] is as follows:

Huber: Let's slide down here real quick. Do you live here or up there?

Pittman: Up there.

H: What did you see?

P: Me and my cousin, and her boyfriend are walking down, and she was trying to grab at me. She was beaten up like right here. He said that she fell down the steps, and he kept saying 'uh, bitch, come on, get up, get up.' My cousin was like I need to call the police when I was walking out.

H: Yeah.

P: So, that's why I called you all.

H: Um, ok.

P: Um, it sounded, I don't know.

H: So, he said she fell, and did she look like she was intoxicated or anything?

P: No. We didn't hear nothing about it. She didn't fall down the steps.

H: Ok. Alright.

Officer Huber testified that his interview with Pittman was to determine if exigent circumstances existed to enter the apartment.

One thing we must highlight is that the footage from Officer Huber's body camera was not played in full at trial. As such, key context was missing. For example, there was no indication, purely from the body camera footage, when Officer Huber's interview with Pittman occurred in the course of the stand-off. But review of Officer Martin's body camera footage, which was played at trial earlier that day, showed the entirety of the stand-off. Comparison of the two

---

[4] In his briefing, Johnson includes the transcript of the entire interview. But, upon review of the cited portion of the video record in Johnson's brief, that additional portion of the video was not played at trial.

videos demonstrates that Officer Huber's interview with Pittman occurred in the first few minutes of the police's arrival at Cheryl's apartment door.[5] The portion of Officer Huber's body camera footage shown at trial was within the first two minutes after the police first knocked on the apartment door. It was less than three minutes after the first knock that Officer Martin called for Officer Huber to join the four other officers, and that is when Officer Huber's interrogation ended.

At this point, the police had only noted blood on the stairwell and on the outside of the door. They had also heard what they believed to be moans from inside the apartment, though Officer Huber was not then present. The officers were intermittently discussing these things and whether exigent circumstances existed based on the blood and moans emanating from inside the apartment. It was approximately nine minutes from the first knock that Officer Martin went outside and was able to look inside the apartment. Based on Officer Martin's observations and his contemporaneous statements made in the video, he believed exigent circumstances existed to "kick that door." It would be another six minutes, however, almost fifteen minutes exactly from the time the first knock was made, before police kicked the door down, and it was only upon the

---

[5] Particularly, the nature of the knocks on the apartment door as heard in Officer Huber's footage while interviewing Pittman can be synced up with Officer Martin's footage. Also, review of Officer Martin's body camera footage shows Officer Huber, identifiable in both videos by his toboggan, leaving the stairwell immediately outside the apartment, where other officers are also standing, and going to conduct the interrogation of Pittman. Finally, Officer Martin can be heard calling for Officer Huber in both videos which concluded the interrogation.

orders of an officer that Officer Martin repeatedly addresses as "sarge" that Officer Huber kicked the door down.

Both parties center their constitutional arguments on the leading cases from the Supreme Court of the United States: *Crawford v. Washington*, 541 U.S. 36 (2004); *Davis v. Washington* and *Hammon v. Indiana*, 547 U.S. 813 (2006); and *Michigan v. Bryant*, 562 U.S. 344 (2011). Also included in the arguments is our opinion in *Rankins v. Commonwealth*, 237 S.W.3d 128 (Ky. 2007).

The Supreme Court in *Crawford* held that pursuant to the Sixth Amendment's Confrontation Clause, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59.[6] The Supreme Court, however, declined to give a definition of 'testimonial' in that case. Instead, it merely listed certain circumstances where the testimonial nature of the statements could not be doubted—"it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68. In *Crawford*, the prosecution had sought to introduce out-of-court statements of the defendant's wife, made during a tape-recorded police interrogation. *Id.* at 39-40.

---

[6] Johnson has not made any argument in his briefing regarding Pittman's availability. We therefore focus solely on the testimonial element.

In *Davis v. Washington* and *Hammon v. Indiana*, the Supreme Court stated

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822. But in *Davis*, the "interrogation" in that case involved the questions of a 911 operator and the victim when the victim was calling for police aid. *Id.* at 826. As such, the Supreme Court held the statements, though a result of an interrogation, were non-testimonial because: 1) the victim was speaking about events as they were happening; 2) the victim was facing an ongoing emergency and "was plainly a call for help against [a] bona fide physical threat;" 3) "the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford* ) what had happened in the past;" and 4) the formality of the interview, which might better be understood as the environment of the interview.[7] *Id.* at 827. Accordingly, the Supreme Court held in *Davis* that the "primary purpose [of the interrogation and statements] was to enable police assistance to meet an ongoing emergency." *Id.* at 828.

---

[7] I.e., the Supreme Court noted the victim's "frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." *Id.* at 827. In contrast, the witness in *Crawford* "was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers[.]" *Id.*

The statements of the victim in *Hammon*, however, "were not much different from the statements we found to be testimonial in *Crawford*." *Id.* at 829.

> Both declarants were actively separated from the defendant . . . Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial.

*Id.* at 830. Moreover, no emergency was ongoing when police first arrived and the victim in fact told the police things were fine. *Id.* at 829-30.

Particularly relevant to the case at hand though, is that given the law as elucidated, the Supreme Court felt it necessary to explicitly reject the idea that "virtually any 'initial inquiries' at the crime scene will not be testimonial[.]" *Id.* at 832. But the Court noted that particularly in cases of domestic abuse

> 'officers called to investigate . . . need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim.' *Hibel [v. Sixth Jud. Dist. Court of Nevada, Humboldt Cnty.]*, 542 U.S. [177 (2004)], at 186, 124 S.Ct. 2451. Such exigencies may *often* mean that 'initial inquiries' produce nontestimonial statements.

*Id.* at 832. Put simply, under a plain reading of *Davis*, the initial inquiries of officers, at least when they respond to domestic disputes, in order to assess the situation, the threat to themselves, and the threat to the victim, may elicit statements that *sound* testimonial but are non-testimonial given the immediate and primary purpose of assessing the situation and threat levels. It all depends

21

on the surrounding context of the situation in which those initial inquiries and their answers are made.

In *Rankins v. Commonwealth*, we summarized our understanding of *Crawford, Davis*, and *Hammon*, thusly:

> Where statements recount potentially criminal past events, the declarant is, for Confrontation Clause purposes, acting as a witness against the accused. More simply, statements that tell "what is happening" are nontestimonial, while statements that tell "what happened" are testimonial. Accordingly, the Court held that the present-tense statements by the victim in *Davis* to the 911 operator were nontestimonial. The statements by the victim to the police officer in *Hammon,* because they related *past* events, were testimonial.

237 S.W.3d 128, 131 (Ky. 2007) (internal citations omitted). If understood in a literal sense, *Rankins* clearly holds that any statement recounting a past event is testimonial under Supreme Court precedent. But we acknowledged in *Hartsfield v. Commonwealth,* that whether the witness' statement was made in the present-tense or recounting a past event was merely one of several factors the Supreme Court commands to be considered to determine whether a statement was testimonial. 277 S.W.3d 239, 244 (Ky. 2011). *Rankins* also held "it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." *Rankins,* 237 S.W.3d at 131 (quoting *Davis, supra,* at 822 n.1).

The statements in *Rankins* quoted above must be clarified as, if taken too literally and out-of-context, they could be contrary to Supreme Court precedent. The Supreme Court has affirmed that merely recounting a past event was not, by itself, enough to make a statement testimonial. *Michigan v.*

22

*Bryant*, 562 U.S. 344, 370 (2011). It has also clarified that "*Davis* requires a combined inquiry that accounts for both the declarant and the interrogator." *Id.* at 367. While the witness' statements must pass constitutional muster and therefore are the focus of the inquiry in that sense, "[o]bjectively ascertaining the primary purpose of the interrogation by examining the statements and actions of *all participants* is also the approach most consistent with our past holdings." *Id.* (emphasis added). We cannot look to the witness' statements alone nor can we apply a grammatical test that merely looks to the past-tense or present-tense of the statements. "[W]hen a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs." *Id.* at 370.

In *Bryant*, the victim was shot and retreated to a gas station. *Id.* at 349. He was shot around 3 a.m., but police did not get the emergency call until 3:25 a.m. *Id.* When police arrived, at least five officers all proceeded to ask the victim, Covington, what happened, who shot him, and where was he shot. *Id.* Covington responded that a man named "Rick" shot him, that he spoke with him through the back door of Rick's house, and "explained that when he turned to leave, he was shot through the door and then drove to the gas station, where police found him." *Id.*

On its face, these questions and the answers recounted a past event, where it occurred, and who was involved. The interrogation took place

23

approximately twenty-five minutes after the shooting occurred. But because these questions were meant to address an ongoing emergency, the primary purpose of the interrogation was not to solicit information relevant for use in a later prosecution but to address that ongoing emergency. *Id.* at 375.

The Supreme Court would later again reaffirm that the touchstone of the inquiry is the primary purpose of the interrogation based on the context in which the interrogation occurred—"under our precedents, a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial. 'Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.'" *Ohio v. Clark*, 576 U.S. 237, 245-46 (2015) (quoting *Bryant, supra*, at 359). "[T]he primary purpose test is a necessary, but not always sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause." *Id.* at 246. A statement is only testimonial when it has the "primary purpose of creating an out-of-court substitute for trial testimony." *Id.* at 250-51 (quoting *Bryant, supra,* at 358).

*Bryant* similarly made clear that

> The existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial because statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation.

562 U.S. at 370. "[T]he scope of an emergency in terms of its threat to individuals other than the initial assailant and victim will often depend on the

24

type of dispute involved." *Id.* at 372. The Supreme Court noted in that case that nothing Covington told the police indicated he was shot because of a private dispute or that the threat from the shooter had ended. *Id.* Therefore, the victim's statements in *Bryant* expanded the scope of the emergency potentially to the police and the public. *Id.* at 373. Courts must not construe an "emergency to last only precisely as long as the violent act itself . . . ." *Id.*

But "the existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry[.]" *Id.* at 374. Courts must still evaluate whether the primary purpose of the interrogation was to meet the ongoing emergency. *Id.* That inquiry, however, is "informed by the circumstances of the ongoing emergency . . . ." *Id.* At this point, *Ohio v. Clark* is instructive. In sharp contrast to a shooting victim in downtown Detroit, as in *Bryant*, the Supreme Court found an ongoing emergency existed involving a three-year old child, a day after his injuries occurred. *Clark*, 576 U.S. at 246. The child had gone to school with visible injuries on his face alerting his teachers, who asked him what happened and who did this. *Id.* at 241. The Supreme Court held the teachers' questions were prompted by "the immediate concern . . . to protect a vulnerable child who needed help." *Id.* at 247. "L.P.'s teachers were not sure who had abused him or how best to secure his safety. Nor were they sure whether any other children might be at risk. As a result, their questions and L.P.'s answers were primarily aimed at identifying and ending the threat." *Id.* The Supreme Court also rejected testing the testimonial nature of statements by whether

25

they had a natural tendency to lead to prosecution, declaring that "irrelevant."

*Id.* at 250.

> The statements at issue in *Davis* and *Bryant* supported the defendants' convictions, and the police always have an obligation to ask questions to resolve ongoing emergencies. Yet, we held in those cases that the Confrontation Clause did not prohibit introduction of the statements because they were not primarily intended to be testimonial.

*Id.*

After this lengthy survey, we now turn to an analysis of the facts before us. Pittman called police for a domestic dispute. Police responded approximately two minutes thereafter to the scene. Officer Huber was one of the responding officers. His interrogation with Pittman occurred within the first two minutes of him and his fellow officers arriving at the door of Martin's apartment. Blood was plainly visible on the stairs immediately outside her apartment. Officer Huber conducted his interrogation a flight below those stairs, with his fellow officers clearly and repeatedly knocking on the door. From this immediate context, the officers, including Huber, had not determined an ongoing emergency existed. Instead, they were confronted with whether an ongoing emergency existed in the first place. They had not come into contact with Martin, so they had not determined the status of the victim; indeed, they had not determined if there was a "victim" even in existence.

The circumstance of this interrogation is not readily analogous to any of those found in *Crawford*, *Davis*, *Hammon*, *Bryant*, or *Clark*. But the informality of the scene where the interrogation happened—a flight below an apartment where there is potentially an ongoing emergency, police are repeatedly

26

knocking on the door, sometimes quite aggressively—does not lend itself to a conclusion tending towards testimonial. "[T]he circumstances lacked any formality that would have alerted [Pittman] to or focused [her] on the possible future prosecutorial use of [her] statements." *Bryant,* 562 U.S. at 377.

Officer Huber asked Pittman, "What did you see?" And Pittman's statements were a recounting of a past event; that Martin "was trying to grab at me. She was beaten up like right here. He said that she fell down the steps and he kept saying, uh, 'bitch, come on, get up, get up.'" Officer Huber then asked, "So, he said she fell, and did she look like she was intoxicated or anything?" This question was prompted by the inherent conflict in Pittman's statement— whether Martin fell or was "beaten up." This obviously went to the very dilemma presented to the police at that moment: did an ongoing emergency exist. At this time, without having established any kind of contact with Martin, the police were confronted with a situation in which a person could potentially be somewhat hurt but not in any kind of emergency; or potentially that a victim could be inside the apartment, possibly even with her assailant (as no contact with Johnson had been established at this time either), and subject to continuing attacks.

Pittman's response to Officer Huber's second question was "No. We didn't hear nothing about it. She didn't fall down the steps." This statement, in and of itself, certainly sounds testimonial. But the overall context counsels against that conclusion. *Bryant* commands that we evaluate the motives, often mixed motives, of victims and witnesses when making statements to the police.

27

*Bryant,* 562 U.S. at 368. Conceivably, Pittman could have understood that this statement could be used in a later prosecution, but the immediate context and the primary motivation at the moment the statement was given, was to give information to the police so they could determine what kind of situation they were dealing with. We also look to the motives of the police officer in asking his questions. *Id.* As made plain above, the police were at that time in a situation in which several key facts were not known, all of which governed their potential actions. If Martin had only fallen but was not seriously injured, then there would be no exigent circumstances to enter the apartment. If Martin had fallen but was severely injured, would that be enough to satisfy exigent circumstances? If she had been attacked, was she safe inside the apartment? Who was her attacker? Where was he? The only thing police knew for sure was that there was a potential victim of domestic violence, as demonstrated by the domestic dispute call and blood on the stairs, and her safety was the immediate question. Officer Huber was not at the time of interrogation primarily seeking to gather evidence for later prosecution but was making an initial inquiry at the scene of a possible crime, which possibly presented an ongoing emergency. *Davis,* 547 U.S. at 832. We conclude that the primary purpose of Pittman's statements was to help police determine whether an ongoing emergency existed and therefore are non-testimonial.

Even if we included the full interview, despite it not being shown at trial, our conclusion would not change. After Officer Huber stated "Ok. Alright." a pause of fifteen seconds occurred. Officer Huber stopped asking questions and

28

Pittman stopped talking; she even turned her body away from Officer Huber and started looking back up the stairs. Pittman then started talking to Officer Huber again, unprompted by him, but what she said is inaudible. The following occurred:

> Huber: So, she was . . . was she conscious when she went in there?
>
> Pittman: She was laying like this here.
>
> H: So, he drugged her in?
>
> P: Yeah, I was only a couple of steps from my apartment, and they were right here at the bottom, and as I walked him out, and she was trying to grab . . . I guess, his hand, it was like she [inaudible].
>
> H: She was trying to grab somebody's hand, ok.
>
> P: Hm-mm.

At this point the interrogation concluded as Officer Martin called Officer Huber back to the apartment door. Officer Huber asked Pittman if Cheryl Martin had been conscious, which obviously goes to her medical state and safety. Pittman's descriptions of the event, and her recounting that Martin was trying to grab somebody's hand, was to describe Martin's physical actions to show she was indeed conscious and responsive at the time. The primary purpose of this second exchange was still relevant to whether or not an ongoing emergency existed; however, the primary purpose of this second exchange could also be more specifically described as ascertaining the medical state of Martin. In either case, the statements would be non-testimonial because their primary purpose was not for "creating an out-of-court substitute for trial testimony." *Bryant*, 562 U.S. at 358; *Clark*, 576 U.S. at 250-51.

29

Johnson argues that Pittman's answers did not provide information to officers for "immediately end[ing] a threatening situation behind an apartment's closed door." He also argues that the emergency should be confined to within Martin's apartment. "A locked door separated her apartment from the stairwell, thus there was no emergency in the stairwell where Pittman met Huber." As for the first argument, its error is in attributing subsequent facts to an earlier period in time. It is true that the police did not kick down the door until they had established a line of sight upon Martin inside the apartment, and that it was her medical condition that ultimately controlled their decision to forcibly enter their apartment. But it does not follow that because the police did not conclude exigent circumstances existed to kick down the door immediately after Officer Huber interrogated Pittman, that such interrogation must have had as its primary purpose creation of an out-of-court substitute for trial testimony. That is a pure non-sequitur. As we concluded, Pittman's statements had as their primary purpose to aid the police in determining whether there was an ongoing emergency. The fact that police could not or did not reach that conclusion after receiving her statements does not negate that purpose.

As to the second argument, it may be true enough that the actual emergency existed within the apartment and Pittman could not describe what was going on behind a closed door. But the events in the stairwell were obviously relevant in helping the police resolve the exact question of whether there was an ongoing emergency within the apartment. Officer Huber's questions were initial inquiries to assess the situation and determine the threat

to and safety of Martin. Pittman's primary purpose in giving her answers were to aid those determinations. The fact that Pittman was not in an ongoing emergency herself does not negate that. Indeed, in *Hartsfield*, we held that a statement was not testimonial, in part, because it was "in the nature of seeking help for an emergency (even though it was not ongoing)." *Hartsfield*, 277 S.W.3d at 245. Pittman was seeking help on behalf of Martin.

Having determined that the statements do not present a constitutional issue, we must still determine whether they were admissible under hearsay exceptions. KRE 803. We will not belabor this point, in an already lengthy opinion. We assume without deciding that Johnson is correct that the statements do not fall within a hearsay exception and proceed to a harmless error analysis. RCr 9.24. "The test for harmlessness is whether the error substantially swayed the verdict." *Allen v. Commonwealth*, 395 S.W.3d 451, 467 (Ky. 2013). If the error had substantial influence "or if one is left in grave doubt, the conviction cannot stand." *Id.* (internal quotation omitted).

Johnson contends that but for Pittman's statements in the video there was no other witnesses the Commonwealth had to discredit his account that Martin fell down the stairs. To the contrary, the testimony of Dr. O'Brien and Nurse Yazel recounted the numerous and significant injuries to Martin, as well as their conclusion that she did not suffer these injuries, or at least a portion of them, from a fall. The unrefuted medical testimony in this case supported the jury's conclusion that Johnson had acted wantonly toward Martin and

31

supported the conviction for assault in the first-degree. Pittman's statements were not substantially influential upon the jury, nor do we have grave doubts.

### C. No Error in Not Polling Jury

Johnson argues he was denied his right to have the jury polled. When the trial court asked if Johnson wished to poll the jury, Johnson and his counsel began an inaudible discussion between them. Finally, counsel replied, "No, your honor, I don't think that is necessary." Johnson immediately interrupted and said, "No. Yes, yes, yes." Counsel asked him, "You do?" At which point, Johnson asserted, "I'm trying to figure out what is going on." More inaudible discussion occurred until Johnson, clearly somewhat perturbed, audibly stated,

> Oh, the verdicts? It just went on. Are you serious? So, no, have we agreed on. No. We agreed on not using hearsay at the beginning of this trial and hearsay was used. It was shown on that DVD. And you, the prosecutor, and the judge agreed on that. What does that mean? A mistrial? It wasn't planned fair or what?

While making this statement, the video record shows Johnson addressing the Commonwealth's Attorney; it was not a discussion with his counsel. Afterward, the trial court simply said "Okay." And Johnson's counsel again stated, "I don't think polling's necessary, your honor."

The right to poll the jury is not explicit in our constitution. Instead, it is grounded in the right of the accused, with counsel, to be present at all stages of the trial. Ky. Const. § 11; *Temple v. Commonwealth*, 77 Ky. 769, 771 (1879). The Defendant

> has a right not only to see and know that the whole jury is present assenting to the verdict, but by polling to demand face to face of

32

> each juror whether the verdict is his verdict, and to object to it unless each member of the jury shall answer for himself that the verdict is his.

*Temple*, 77 Ky. at 771. On the other hand, Section 11

> does not make it necessary under all circumstances for the accused to be present at every stage of the trial. All that it does is to guarantee his right to be present if he so desires. This court has held in a number of cases that the privileges guaranteed by this section are personal to the accused and may be waived.

*Boering v. Beard,* 10 S.W.2d 447, 450 (Ky. 1928). Thus, the failure to poll the jury when requested and preserved is reversible error. *Id.* at 447. But absence does not void the judgment. *Id.* at 451. It is also important to note that there is no rule requiring trial courts to automatically poll the jury; it is only required when requested by a party. RCr 9.88.

In *Temple,* the conviction was reversed when the jury verdict was received by the trial court in absence of both the defendant and his counsel. *Temple,* 77 Ky. at 770. In *Powell v. Commonwealth,* the conviction was reversed when the verdict was received with the defendant present but not his counsel. 346 S.W.2d 731, 733 (Ky. 1961). In that case, the Court assumed that the defendant did not know he had a right to poll the jury. *Id.* And that assumption provides a necessary caveat to the Court's statement that though polling the jury may be waived, "in such a case the waiver should be so clear and unequivocal as to indicate a conscious intent." *Id.* at 734. In other words, because the defendant was assumed to not know he had a right to poll the jury, the failure of the defendant to assert that right, in absence of his counsel, could not be considered waiver. This is in contrast to *Asher v. Commonwealth,* where without any mention of absence of either the Defendant or his counsel,

the Court held that because "the record fails to show that he made any request for a poll of the jury . . . it follows that the appellant by failing to make such a request waived his right to such a poll." 299 S.W. 568, 568 (Ky. 1927).

In this case, Johnson and counsel were present. The issue is whether Johnson, distinct from his attorney, asserted his right to poll the jury such that the failure to do so by the trial court was reversible error. "In the absence of exceptional circumstances, a defendant is bound by the trial strategy adopted by his counsel." *Breazeale v. Commonwealth*, 600 S.W.3d 682, 694 (Ky. 2020) (quoting *Salisbury v. Commonwealth*, 556 S.W.2d 922, 927 (Ky. App. 1977)). Johnson's counsel twice gave an unequivocal answer that polling was unnecessary. Johnson, as clear from the record, was not sure what exactly was being asked by the trial court. He queried "What just happened?" and then declared "I'm trying to figure out what is going on." Then he began to address the Commonwealth's Attorney specifically—not his counsel nor the trial court—about hearsay evidence and the body camera footage addressed earlier in this opinion. Although Johnson did declare "Yes, yes, yes," it is clear from the entire context that Johnson was attempting to argue substantive issues regarding the admission of hearsay evidence, and not that he wanted the trial court to ensure each individual juror's assent to the verdict. Under these circumstances, we cannot say that Johnson asserted his right to poll the jury. Nor do we think this provides an "exceptional circumstance" that Johnson should not be bound by the two waivers of the right by his counsel. Therefore, we hold there was no error.

## D. Directed Verdict for First-degree Robbery (Latasha Martin) should have been Granted, but otherwise Trial Court is Affirmed

Johnson argues he should have been granted a direct verdict as to the first-degree robbery charge relating to Latasha Martin because the trial court had granted a directed verdict for the fourth-degree assault charge against him relating to Latasha Martin, both stemming from the same events. Because the trial court specifically concluded there was no evidence Latasha Martin was physically injured as required by the fourth-degree assault statute, KRS 503.080(1)(a), Johnson argues he could not simultaneously be guilty of first-degree robbery or complicity thereto, which also requires a physical injury, if there has not been a dangerous weapon or dangerous instrument used. KRS 515.020(1)(a). He also argues that he should have been granted a directed verdict on the first-degree robbery charge relating to Cheryl Martin and intimidating a witness in a legal proceeding related to Cheryl Martin.

> The legal standards for a directed verdict motion are clear: "[i]f under the evidence as a whole it would not be clearly unreasonable for a jury to find the defendant guilty, he is not entitled to a directed verdict of acquittal." *Trowel v. Commonwealth*, 550 S.W.2d 530, 533 (Ky. 1977). "The trial court must draw all fair and reasonable inferences from the evidence in favor of the party opposing the motion, and a directed verdict should not be given unless the evidence is insufficient to sustain a conviction. The evidence presented must be accepted as true. The credibility and the weight to be given the testimony are questions for the jury exclusively." *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983). The standard for appellate review is equally clear: "[o]n appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

*Eversole v. Commonwealth*, 609 S.W.3d 209, 217-18 (Ky. 2020).

35

As to Johnson's first argument, we agree. Under the facts of this case, the fourth-degree assault against Latasha required a physical injury with intentional or wanton state of mind. KRS 508.030(1)(a). The only evidence supporting the physical injury of Latasha was Cheryl's testimony that Johnson's friends jumped Latasha and hit her, but Cheryl explicitly stated she did not *see* that happen. Fourth-degree assault is a lesser-included offense to first-degree robbery. *Mack v. Commonwealth*, 136 S.W.3d 434, 439-40 (Ky. 2004). The principal difference between the two is that first-degree robbery requires an additional element of "in the course of committing theft . . . ." *Id.* at 439; KRS 515.020(1). Because the trial court dismissed the fourth-degree assault charge for the failure of proof regarding physical injury—an element shared by both charges—Johnson is correct in his assertion that there was equally a failure of proof on the physical injury for the first-degree robbery charge.

> In *Campbell v. Commonwealth*, this Court held
>
> the defendant is entitled to a complete acquittal i. e., when, looking at the evidence as a whole, it would be clearly unreasonable for a jury to find the defendant guilty, under any possible theory, of any of the crimes charged in the indictment *or of any lesser included offenses.*

564 S.W.2d 528, 530 (Ky. 1978), *overruled on other grounds by Ray v. Commonwealth*, 611 S.W.3d 250, 265 (Ky. 2020) (emphasis added). If there is a failure of proof for an element of the greater-offense that is shared by the lesser-included offense, then a directed verdict on the greater-offense on the basis of that failure of proof extends down to the lesser-included offenses as

36

well. We see no reason why it should not also extend upward. If the Commonwealth has failed to prove an element of a lesser-included offense that is shared by the greater offense, it is illogical to grant a directed verdict upon the lesser-included offense but not also the greater-offense. Here the trial court found insufficient proof for physical injury regarding fourth-degree assault. It stated, "We need more . . . We just don't have anything about physical injury here." There could not at the same time be sufficient proof for physical injury under first-degree robbery since both charges stemmed from the same alleged event—the "jumping" of Latasha by Johnson's friends—and the same testimony. Therefore, the trial court should have granted a directed verdict as to the first-degree robbery regarding Latasha Martin. Johnson's conviction for complicity to first-degree robbery against Latasha Martin is reversed.

As to the second and third arguments, however, we disagree. As to the first-degree robbery related to Cheryl Martin, Johnson argues that he did not intend to deprive her of her property when he took her phone, citing *Hall v. Commonwealth*, 551 S.W.3d 7 (Ky. 2018). Johnson argues that here "the evidence shows he lacked intent to permanently deprive Ms. Martin of her cellphone or dispose of it where she could never find it. Absent the intent to deprive her of the cellphone, there is no theft, and thus no robbery."

We recognize that first-degree robbery incorporates the elements of theft by unlawful taking. *Lloyd v. Commonwealth*, 324 S.W.3d 384, 390 (Ky. 2010). Therefore, *Hall* is instructive but not controlling. In that case, we held, under KRS 514.030, the theft by unlawful taking statute, "that no reasonable juror

37

would think that a defendant who uses a police cruiser to flee from police, then abandons it in the middle of the road with the police in hot pursuit, intends that the property not be restored to the police." *Hall*, 551 S.W.3d at 15. In other words, there was no intent to deprive, under the statutory definition of that word. *Id.* at 12-14. *Hall* held that one definition of deprive was "withhold property of another permanently." *Id.* at 13; KRS 514.010(1)(a). It then provided a definition of that phrase as "the property never be restored to its rightful owner." *Id.* One can withhold property without maintaining actual possession of it, and one can even abandon the property and still be withholding it. *Id.* The reason *Hall* is not controlling is because that case did not deal with the destruction of the property after it was stolen. That Johnson took Martin's phone is not disputed; the dispossession of property is conceded. The phone was recovered, broken and "split in half" according to Martin, outside the apartment building. It was able to receive a phone call, but Martin testified the phone only rang once and she had to replace it. Johnson argues that this does not constitute intent to permanently deprive Martin of her phone because he merely "discarded" it in an easily recoverable location outside the apartment building and that the phone still worked.

Although *Lloyd* recognized the elements of theft by unlawful taking are incorporated into first-degree robbery, it is not clear that there is a strict 1:1 incorporation. First, KRS 515.020 does not require a completed theft, only an attempt—"we view the first-degree robbery provision as a deterrent to assaulting an individual . . . with the intention of unlawfully obtaining his

38

property whether any of that property is actually taken or not." *Lamb v. Commonwealth*, 599 S.W.2d 462, 464 (Ky. 1979). Second, *Lamb* also recognizes the General Assembly's intent of the first-degree robbery statute was to emphasize the crime upon the person and de-emphasize the crime to property. *Id.* at 463. In contrast, theft by unlawful taking only focuses on the property. In *Lamb*, the defendant did not gain possession of any property at all, but he tried to do so at knifepoint. *Id.* at 462. Thus, it is not clear that the subsequent actions Johnson took with the phone are relevant. The phone being taken, accompanied by a physical injury by Johnson upon Martin by his use of physical force, strikes us as a textbook example of first-degree robbery.

But we need not solve this riddle to reach a resolution. Considering Johnson's subsequent actions with the phone—his destruction of it such that it was "split in half," it was only able to ring once afterward, and the necessity to replace it by Martin—surely constitutes a deprivation of her property. A cell phone that cannot function is only barely distinguishable from a paperweight, and obviously has no utility and little, if any, value. The taking of property and its subsequent destruction so that it can no longer function as normal constitutes an act of withholding property of another permanently. The act of destruction is the means by which the withholding is accomplished, much like *Hall* recognized an act of abandonment can also be the means of withholding property. *Hall*, 551 S.W.3d at 13. Martin's recovery of the physical device itself does nothing for Johnson, first, because to give that factor any weight would be contrary to the legislative intent behind KRS 515.020 to de-emphasize the

crime to property. *Lamb*, 599 S.W.2d at 463. And secondly, because KRS 515.020 does not require an accomplished theft. *Id.* Imperfect destruction of the phone qualifies as an incomplete withholding of property of another. Because the intention to do a criminal act "can be inferred from facts and circumstances[,]" *Hall*, 551 S.W.3d at 13, it was not unreasonable for the jury to find guilt for first-degree robbery under the evidence as a whole.

Johnson also argues that he took the phone prior to any physical force upon Martin, or in other words, that the theft was accomplished prior to the physical force and physical injury. The law does not require a chronological priority of physical force, physical injury, then theft. So long as the physical force is used "in the course of committing theft . . ." and there was an "intent to accomplish the theft . . . ," KRS 515.020(1), then whether or not a theft is even accomplished, so long as it is attempted, and physical injury to a person not a participant in the crime results, then one is guilty of first-degree robbery. Martin's testimony establishes that the physical force and injury occurred immediately after the theft; she did not imply any significant break in time between the theft and the physical injury. She said, "He drug from me from my front room to my kitchen after snatching my phone out of my hand. And held me up on the wall, and then drug me to the hallway and threw me down a flight of steps." We therefore cannot say as a matter of law that Johnson's infliction of physical injury upon Martin was not in the course of committing theft, and therefore it was not unreasonable for a jury to find guilt for first-degree robbery under the evidence as a whole.

Finally—as to the directed verdict for intimidating a participant in the legal process related to Cheryl Martin, citing *Edmonds v. Commonwealth*, 433 S.W.3d 309, 321 (Ky. 2014)—Johnson argues the law requires some prior crime had to have occurred prior to the intimidation, or threat, which he argues did not happen here. Instead, because he took Martin's phone prior to assaulting her, and the assault itself was part of the intimidation, there is a failure of proof requiring a directed verdict. But Cheryl testified that prior to Johnson taking her phone she had ordered him and his friends to leave her apartment and had threatened to call the police. When she came back to the apartment after giving Johnson time to leave, he was still there, and apparently inviting additional friends over. It was then after one of those friends arrived that he took Martin's phone and assaulted her. Martin testified that she believed Johnson had taken her phone to prevent her from calling the police. A criminal trespass, a Class A misdemeanor, occurs when a person "knowingly enters or remains unlawfully in a dwelling." KRS 511.060(1). Johnson was not a co-tenant with Martin. When Martin told him that he needed to leave her apartment, that constituted a revocation of his privilege to be in her dwelling.

Under KRS 524.020, "if the legal process *could* be invoked, and a defendant intends to prevent a victim from participating in the legal process, then this statute can apply." *Edmonds*, 433 S.W.3d at 319. If Johnson meant to "intentionally hinder or delay" Martin "from reporting the crime he committed that could legally result in criminal charges being brought against him[,]" then he has intimidated a participant in the legal process. *Id.* at 321.

41

Here Martin's testimony supported the conclusion that Johnson had committed a crime, criminal trespass, and that she had threatened to call the police to effectuate his removal. A jury could then reasonably infer that Johnson knew the legal process could be invoked against him, and that when he took the phone from her hand and assaulted her, he was attempting to hinder or delay Martin from contacting the police. Finally, our decision in *Edmonds* expressly overruled *Moreland v. Commonwealth*, 322 S.W.3d 66 (Ky. 2010). *Id.* at 319. Therefore, under *Edmonds*, threats to kill a victim qualify as intimidating a participant in the legal process. *Id.* at 318. Martin testified that Johnson threatened to kill her as he was leaving her apartment. It was not unreasonable for the jury to find guilt for intimidating a participant in the legal process related to Martin under the evidence as a whole.

### III.    Conclusion

For the aforementioned reasons, we affirm Johnson's convictions save for the complicity to first-degree robbery conviction related to Latasha Martin. We remand to Jefferson Circuit Court to amend the judgment and sentence accordingly. We additionally note, although Johnson has not argued it on appeal, that because he was convicted of first-degree robbery and fourth-degree assault against Cheryl Martin from the December 26, 2019, incident, that the latter charge is a lesser-included offense to the former. *Mack*, 136 S.W.3d at 439-40. This a double jeopardy violation which requires vacatur of the lesser offense. *Sevier v. Commonwealth*, 434 S.W.3d 443, 453 (Ky. 2014). The record shows the jury found him guilty of both counts but we cannot find a

42

concomitant instruction for fourth-degree assault in the penalty phase instructions to the jury. Nonetheless, the trial court sentenced him to twelve months in prison for that count, to be served concurrently with the rest. Because there was a conviction and sentence for both the first-degree robbery and fourth-degree assault against Cheryl Martin on December 26, 2019, we vacate that fourth-degree assault conviction. The trial court upon remand is instructed to amend its judgment and sentence accordingly.

All sitting. VanMeter, C.J.; Bisig, Keller, Lambert, and Nickell, JJ., concur. Thompson, J., concurs in result only.

COUNSEL FOR APPELLANT:

Christopher B. Thurman
Assistant Appellant Advocate
Lousiville Metro Public Defender's Office

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Jeffrey Allan Cross
Assistant Solicitor General